No. 19-60662
c/w No. 19-60678

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE FIFTH CIRCUIT

Dennis Hopkins, individually and on behalf of a class of all others similarly situated; Herman Parker, Jr., individually and on behalf of a class of all others similarly situated; Walter Wayne Kuhn, Jr., individually and on behalf of a class of all others similarly situated; Byron Demond Coleman, individually and on behalf of a class of all others similarly situated; Jon O'Neal, individually and on behalf of a class of all others similarly situated; Earnest Willhite, individually and on behalf of a class of all others similarly situated,
*Plaintiffs-Appellees,*
*v.*
Secretary of State Delbert Hosemann, in his official capacity,
*Defendant-Appellant*

Appeal from the United States District Court
for the Southern District of Mississippi
No. 3:18-cv-188

## Defendant-Appellant's Petition for Rehearing En Banc

Lynn Fitch
  *Attorney General*
Scott G. Stewart
  *Solicitor General*
Justin L. Matheny
Anthony M. Shults
  *Deputy Solicitors General*
Mississippi Attorney
  General's Office
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: justin.matheny@ago.ms.gov
*Counsel for Defendant-Appellant*

## CERTIFICATE OF INTERESTED PERSONS

Under this Court's Rule 28.2.1, governmental parties need not furnish a certificate of interested persons.

*s/ Justin L. Matheny*
Justin L. Matheny
*Counsel for Defendant-Appellant*

# FED. R. APP. P. 35(b)(1) STATEMENT

A divided panel in this case held—for the first time in our Nation's history—that a law disqualifying felons from voting is a cruel and unusual punishment. The panel's sweeping invalidation of a decades-old state constitutional provision is irreconcilable with Supreme Court and Fifth Circuit precedent, conflicts with decisions of other circuits, and—if left to stand—will inflict profound damage and sow widespread confusion. This Court should grant rehearing en banc to maintain uniformity of decision and address issues of exceptional importance. Fed. R. App. P. 35(a).

The panel decision conflicts with binding precedent. The panel ruled that it could invalidate a category of felon disenfranchisement, that Mississippi's disenfranchisement law imposes "punishment" under the U.S. Constitution, and that that law is cruel and unusual. As Judge Jones explained in dissent, all those conclusions are wrong. First, the panel did not have the option of stripping Mississippi of its power to disenfranchise felons indefinitely. Longstanding Supreme Court precedent rejects the view that a State is barred from indefinitely disenfranchising an entire category of felons. Second, even if that were not so, the panel was wrong to conclude that Mississippi's disenfranchisement of felons is a "punishment" subject to the Eighth Amendment. Under Supreme Court precedent, Section 241 of the Mississippi Constitution is a nonpunitive voting regulation. Third, even if disenfranchisement were a punishment,

it is not cruel and unusual. The Constitution recognizes that States may disenfranchise felons, it places no temporal limits on that power, nearly every State disenfranchises some felons, and many States still permanently disenfranchise some felons.

The panel decision also conflicts with decisions of other circuits. Over 50 years ago, the Second Circuit—in a decision by Judge Friendly—rejected an Eighth Amendment challenge to a felon-disenfranchisement law. That court held that felon disenfranchisement is not a punishment and, even if it were, it is not cruel and unusual. The panel here reached the opposite conclusions. The panel decision also conflicts with Eleventh Circuit precedent upholding a disenfranchisement law like Mississippi's.

The panel decision raises questions of exceptional importance. The panel invalidated a longstanding constitutional provision that this Court recently upheld en banc. The decision strips Mississippi of a power that federal law recognizes that it possesses. That power is important: it concerns who is eligible to participate in making the State's laws. The decision opens to question other disenfranchisement laws and many laws imposing collateral consequences on those convicted of crimes.

Two years ago this Court took en banc a case challenging the same constitutional provision the panel invalidated here. This Court did that even though the panel decision upheld that provision and raised no circuit conflict. The panel decision here is a far stronger candidate for further review. That decision invalidates the same provision and throws

settled practice into chaos. When combined with the panel majority's departures from Supreme Court, Fifth Circuit, and other circuits' precedents, the case for rehearing en banc is overwhelming.

_s/ Justin L. Matheny_
Justin L. Matheny
_Counsel for Defendant-Appellant_

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTERESTED PERSONS ........................................i

FED. R. APP. P. 35(b)(1) STATEMENT ....................................ii

TABLE OF AUTHORITIES ....................................................vi

STATEMENT OF THE ISSUE ................................................1

STATEMENT OF FACTS AND COURSE OF PROCEEDINGS .............1

REASONS FOR GRANTING REHEARING EN BANC .........................3

    A.    The Panel Decision Conflicts With Decisions Of The U.S. Supreme Court And This Court................................................3

    B.    The Panel Decision Conflicts With Decisions Of Other Courts Of Appeals ...............................................................12

    C.    The Panel Decision Raises Questions Of Exceptional Importance .........................................................................14

CONCLUSION ..............................................................16

CERTIFICATE OF SERVICE ................................................17

CERTIFICATE OF COMPLIANCE ...........................................17

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Green v. Board of Elections of City of New York*,
 380 F.2d 445 (2d Cir. 1967) .................................... 10, 12, 13

*Harness v. Hosemann*,
 988 F.3d 818 (5th Cir. 2021) .................................................. 2

*Harness v. Watson*,
 47 F.4th 296 (5th Cir. 2022) (en banc) ........................... 2, 16

*Harness v. Watson*,
 143 S. Ct. 2426 (2023) ......................................................... 2

*Hunter v. Underwood*,
 471 U.S. 222 (1985) ............................................................. 5

*Maryland v. King*,
 567 U.S. 1301 (2012) ......................................................... 14

*Richardson v. Ramirez*,
 418 U.S. 24 (1974) .............................................. 4-6, 9-11, 15

*Robinson v. California*,
 370 U.S. 660 (1962) ............................................................. 5

*Smith v. Doe*,
 538 U.S. 84 (2003) ................................................. 7, 8, 9, 13

*Thompson v. Alabama*,
 65 F.4th 1288 (11th Cir. 2023) ...................................... 8, 13

*Trop v. Dulles*,
 356 U.S. 86 (1958) ........................................... 6, 7, 9, 12, 13

*United States v. Farrar*,
876 F.3d 702 (5th Cir. 2017) .................................................. 11

## Constitutional Provisions

Miss. Const. art. XII, § 241 ............................................ii, 1-3, 6-11, 13, 14

U.S. Const. amend. VIII ............................................ii, iii, 1-3, 5, 6, 11, 13

U.S. Const. amend. XIV ............................................ 1, 2, 4, 5, 10, 13, 15

## Statutes

Act of Feb. 23, 1870, ch. 19, 16 Stat. 67 .................................................. 9

Act of Mar. 2, 1867, ch. 153, 14 Stat. 428 ............................................... 10

Miss. Code Ann. § 23-15-11 ..................................................................... 7

Miss. Code Ann. § 23-15-19 ..................................................................... 7

Miss. Code Ann. § 97-13-25 ..................................................................... 15

## Rule

Fed. R. App. P. 35 ..................................................................................ii

## STATEMENT OF THE ISSUE

Does Section 241 of the Mississippi Constitution, which makes certain felons indefinitely ineligible to vote, violate the federal Constitution's prohibition of cruel and unusual punishments?

## STATEMENT OF FACTS AND COURSE OF PROCEEDINGS

Like other States, Mississippi imposes qualifications on who may vote. These address residency, age, citizenship, registration, and criminal history. Miss. Const. art. XII, § 241. This case concerns that last qualification.

The U.S. Constitution recognizes that a State may deny its citizens "the right to vote" "for participation in rebellion, or other crime." U.S. Const. amend. XIV, § 2. Mississippi has always disqualified certain felons from voting. For over fifty years, Section 241 of its constitution has disqualified those convicted of "murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy." Miss. Const. art. XII, § 241.

Plaintiffs are Mississippi citizens who are disqualified from voting because of their felony convictions. In 2018 they filed this lawsuit claiming (as relevant here) that Section 241's permanent disenfranchisement for listed felonies violates the Eighth Amendment, as applied to the States by the Fourteenth Amendment. ROA.19-

60662.14-63. The district court certified a class of those convicted of listed crimes who have completed their sentences. ROA.19-60662.4848. The court consolidated the case with *Harness v. Hosemann*, No. 3:17-cv-791 (S.D. Miss.), a case claiming that Section 241 violates the Equal Protection Clause because it is tainted by racial animus.

The district court rejected plaintiffs' Eighth Amendment claim. ROA.19-60662.4878. The court reasoned that section 2 of the Fourteenth Amendment recognizes that a State may deny the vote "for participation in rebellion, or other crime," U.S. Const. amend. XIV, § 2, and that "it would be internally inconsistent for the Eighth Amendment to prohibit criminal disenfranchisement" when "[section] 2 of the Fourteenth Amendment permits it." ROA.19-60662.4878. The court also rejected the *Harness* plaintiffs' equal-protection claim. ROA.19-60662.4865-4875. The court granted summary judgment to the State on both claims and severed the lawsuits. ROA.19-60662.4884. Appeals in both cases followed.

*Harness* reached a decision faster. A panel affirmed the rejection of the *Harness* plaintiffs' equal-protection claim. 988 F.3d 818 (5th Cir. 2021). This Court went en banc and again affirmed, ruling that the *Harness* plaintiffs failed to show that Section 241 is tainted by racial animus. 47 F.4th 296, 311 (5th Cir. 2022) (en banc). The Supreme Court denied certiorari over a dissent. 143 S. Ct. 2426 (June 30, 2023).

On August 4, 2023, a divided panel in this case reversed the summary judgment on plaintiffs' Eighth Amendment claim and held "that permanent disenfranchisement inflicted by Section 241 ... is cruel and unusual punishment in violation of the Eighth Amendment." Op. 23. The panel held that precedent does not foreclose plaintiffs' claim (Op. 23-28), that permanent disenfranchisement under Section 241 is "punishment" subject to the Eighth Amendment (Op. 28-32), and that Section 241 imposes a "cruel and unusual" punishment (Op. 32-44). That last holding rested on a perceived national consensus against permanently disenfranchising those who have completed their sentences (Op. 34-39) and the panel majority's "independent judgment" that such disenfranchisement is cruel and unusual (Op. 39-44). The panel remanded "with instructions" to declare "Section 241 unconstitutional" and "enjoin[ ]" its enforcement against the plaintiff class. Op. 45. Judge Jones dissented. Diss. 52-67.

## REASONS FOR GRANTING REHEARING EN BANC

### A.    The Panel Decision Conflicts With Decisions Of The U.S. Supreme Court And This Court.

The panel held unconstitutional the Mississippi Constitution's indefinite disqualification of certain felons from voting. That decision conflicts with controlling precedent at each turn.

1. The panel was wrong to think that it could strip Mississippi of its power to disenfranchise felons indefinitely. Op. 23-28. Supreme Court precedent forecloses that option.

In *Richardson v. Ramirez*, 418 U.S. 24 (1974), the Supreme Court rejected the view that the Fourteenth Amendment bars a State from indefinitely disenfranchising felons. *Id.* at 56; *see id.* at 41-56. The Court reasoned as follows: Section 2 of the Amendment apportions congressional representation based on state population, but reduces that representation if a State denies the right to vote to certain adult male citizens. U.S. Const. amend. XIV, § 2. That latter rule has one exception: a State is not penalized when it denies the vote "for participation in rebellion, or other crime." *Ibid.* That text means that "the exclusion of felons from the vote has an affirmative sanction in" section 2. 418 U.S. at 54. Section 2's "legislative history" (*id.* at 43; *see id.* at 43-48) and "the historical understanding of the Fourteenth Amendment" (*id.* at 53; *see id.* at 48-53) confirm that that text "mean[s] what it says." *Id.* at 43; *see id.* at 54. And given section 2's text and history, the Equal Protection Clause—in section 1 of the Amendment—cannot and does not prohibit a State from disenfranchising felons. *Id.* at 54-56. Section 1 "could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced

representation" that section 2 "imposed for other forms of disenfranchisement." *Id.* at 55. So the Fourteenth Amendment does not prohibit a State from "exclud[ing] from the franchise convicted felons who have completed their sentences and paroles." *Id.* at 56.

*Richardson* forecloses the panel's holding. Diss. 55-58. The panel held that the Eighth Amendment bars indefinite disenfranchisement of felons who have completed their sentences. Op. 23, 44-45. The Eighth Amendment applies to the States through section 1 of the Fourteenth Amendment. *See Robinson v. California*, 370 U.S. 660, 667 (1962). So the panel decision rests on the view that section 1 of the Fourteenth Amendment bars what section 2 allows. *Richardson* dooms that view. 418 U.S. at 54-55.

The panel thought that it was free to reach its conclusion because *Richardson* rejected an equal-protection claim and so left open other challenges to disenfranchisement. Op. 23-28. But, as explained, plaintiffs' challenge is rooted in the Fourteenth Amendment, and *Richardson* rejects the view that section 1 of that Amendment overrides section 2. Diss. 55-56. The panel added that *Richardson* does not immunize disenfranchisement laws from constitutional challenge: *Hunter v. Underwood*, 471 U.S. 222 (1985), after all, invalidated a disenfranchisement law because it was tainted by purposeful racial

discrimination. Op. 24, 27-28. But although other constitutional provisions may "limit[ ] ... the exercise of a legitimate power," they "cannot void the power entirely." Diss. 57 (quotation marks omitted). The panel ruled that "permanent disenfranchisement" is "entirely unconstitutional"—voiding a large swath of the power recognized in section 2. *Ibid. Richardson* bars that.

2. Even if the panel had the option of categorically invalidating a form of felon disenfranchisement, it erred in ruling that Section 241 imposes a "punishment" subject to the Eighth Amendment. Op. 28-32.

A Supreme Court plurality has already signaled that a disenfranchisement law like Mississippi's "is not a punishment." Diss. 59. In *Trop v. Dulles*, 356 U.S. 86 (1958), a four-Justice plurality explained: A bank robber "loses his right to liberty and often his right to vote." *Id.* at 96 (plurality opinion). "If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal." *Ibid.* "But because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise." *Id.* at 96-97. That explanation alone strongly supports the view that disenfranchisement is not punishment.

Even without *Trop*, Supreme Court precedent shows that Section 241 does not impose punishment. In deciding whether a state action is a "punishment" under the U.S. Constitution, the Court has assessed whether the legislature "inten[ded] ... to impose punishment" and (if it did not) whether the "statutory scheme is so punitive either in purpose or effect as to negate" the State's intention to deem it "civil and nonpunitive." *Smith v. Doe*, 538 U.S. 84, 92 (2003) (quotation marks omitted). Under that framework, Section 241 is not "punishment."

Section 241's text and structure "demonstrate[ ] that it was not intended as a penal measure." Diss. 60. Section 241 defines "a qualified elector." Miss. Const. art. XII, § 241. Only those who meet certain qualifications—one who is an adult resident citizen, is "duly registered" to vote, and has "never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy"—"is declared to be a qualified elector." *Ibid.* The provision does not punish but instead regulates voting eligibility. Context confirms this. Section 241 is titled "Qualifications for electors," it appears in the state constitution's "Franchise" article, and its implementing statutes are in the Election Code (not the Criminal Code), *see* Miss. Code Ann. §§ 23-15-11, 23-15-19. Section 241 nowhere even "hint[s] at a punitive intent toward felons any more than it implies an

intent to punish non-citizens, short-term residents of Mississippi, those unregistered to vote, or those under the age of eighteen." Diss. 61.

Section 241 is also not "punitive ... in purpose or effect." *Smith*, 538 U.S. at 92. All factors "most relevant" to this assessment confirm this. *Id.* at 97. Disenfranchisement is not "regarded in our history and traditions as a punishment." *Ibid.* Instead, by "long tradition," disenfranchisement has operated on a judgment about who should have "the right to participate in making" the laws. Diss. 54. Disenfranchisement imposes no "affirmative disability or restraint." *Smith*, 538 U.S. at 97. Unlike "the infamous punishment of imprisonment," disenfranchisement just "remove[s] the civil rights of individuals due to their criminal behavior as part of the State's regulatory power." *Thompson v. Alabama*, 65 F.4th 1288, 1306 (11th Cir. 2023) (quotation marks omitted). Disenfranchisement does not "promote[ ] the traditional aims of punishment"—deterrence and retribution. *Smith*, 538 U.S. at 97. "It is very unlikely that an individual considering whether to commit a felony would be willing to risk imprisonment but not disenfranchisement." *Thompson*, 65 F.4th at 1307. And nothing in Section 241 shows a retributive aim. Section 241 also "has a rational connection to a nonpunitive purpose" and is not "excessive with respect to this purpose." *Smith*, 538 U.S. at 97. Section 241 adopts a reasonable choice of

8

disqualifying crimes. Each listed crime is serious, probative of dishonesty or poor civic virtue, a common-law crime whose gravity has long been recognized, a crime that has commonly triggered disenfranchisement—or a combination of these features. Indefinitely denying the vote on those grounds is reasonable and enjoys a long tradition.

In concluding that Section 241 imposes "punishment," the panel majority did not seriously confront *Trop*, *Smith*, or Section 241's text and structure. It instead focused on Mississippi's Readmission Act. Op. 28-32. That Act barred Mississippi from disqualifying "any citizen or class of citizens" from voting "except as a punishment." Act of Feb. 23, 1870, ch. 19, 16 Stat. 67, 68. In the panel majority's view, that Act requires concluding that disenfranchisement in Mississippi is "punishment" for federal constitutional purposes. Op. 29, 32.

That is wrong. The Reconstruction-era Congress itself treated disenfranchisement as a matter of voter qualifications rather than punishment. The Reconstruction Act, which set the stage for the Readmission Act by "establish[ing] conditions on which the former Confederate States would be readmitted to representation in Congress," shows this. *Richardson*, 418 U.S. at 49. The Reconstruction Act prescribed requirements for state elections of delegates to form new state constitutions, provided that States could exclude from such elections

persons who were "disenfranchised for participation in the rebellion or for felony at common law," and treated that and other eligibility features as "qualifications" for "the elective franchise." Act of Mar. 2, 1867, ch. 153, 14 Stat. 428, 429. The Readmission Act itself recognizes the State's power to disenfranchise. That statute does not negate the very power it recognizes. Diss. 62. The panel should have read that Act's "punishment" reference to mean "consequence of a crime." *Ibid.*

3. Even if Section 241 imposed "punishment," the panel was wrong to hold that permanent felon disenfranchisement is cruel and unusual. Op. 32-44.

Permanent felon disenfranchisement is not cruel and unusual. When the Fourteenth Amendment was adopted, 29 of the 36 States "had provisions in their constitutions which prohibited, or authorized the legislature to prohibit," felons from voting. *Richardson*, 418 U.S. at 48. A century later, most state constitutions prohibited or authorized the legislature to prohibit felons from voting. *Green v. Bd. of Elections of City of New York*, 380 F.2d 445, 450 (2d Cir. 1967) (42 such provisions). Fifty years ago, the Supreme Court recognized that States may "exclude some or all convicted felons from the franchise." *Richardson*, 418 U.S. at 53; *see id.* at 54. Today nearly every State disenfranchises some felons.

If the panel had applied that analysis it could not have reached the judgment it did. But the panel invalidated Section 241 using the analysis the Supreme Court has applied to claims that certain punishments categorically violate the Eighth Amendment. That was error.

First, the panel was wrong to apply a categorical analysis. Fifth Circuit precedent dictates that it is "improper to undertake a categorical analysis" when the Supreme Court has "never established a categorical rule prohibiting" a practice. *United States v. Farrar*, 876 F.3d 702, 717 (5th Cir. 2017). The Supreme Court has applied a categorical analysis "only for death-penalty cases and those involving juvenile offenders sentenced to life-without-parole." *Ibid.* The panel should have upheld Section 241 on the textual and historical analysis set out above.

Second, even if categorical analysis applied, plaintiffs' challenge would fail. Under that analysis, a court assesses "objective indicia of society's standards" to discern whether there is a "national consensus against the sentencing practice" and then "determine[s] in the exercise of its own independent judgment whether the punishment in question violates the Constitution." *Farrar*, 876 F.3d at 716-17. There is no "national consensus" against indefinite disenfranchisement. *Richardson* invoked "settled historical and judicial understanding" in upholding California's permanent-disenfranchisement regime. 418 U.S. at 54.

About a third of States still use the practice. Nearly all States disenfranchise in some circumstances, and States disenfranchise in such varied ways that a court cannot soundly condemn indefinite disenfranchisement. Diss. 64-65. That leaves the panel majority's "independent judgment." To the extent that such a judgment is anything but a legally rootless exercise of raw will (Diss. 66-67), the panel majority's judgment is unsound. The people of Mississippi have overwhelmingly disagreed with it—and no judge in the history of American law had embraced it before now.

### B. The Panel Decision Conflicts With Decisions Of Other Courts Of Appeals.

1. The panel decision conflicts with the Second Circuit's decision in *Green v. Board of Elections of City of New York*, 380 F.2d 445 (2d Cir. 1967) (Friendly, J.). *Green* rejected, "on two grounds," a claim that felon disenfranchisement is a cruel and unusual punishment. *Id.* at 450-51. First, *Green* held that "[d]epriving convicted felons of the franchise is not a punishment but rather is a 'nonpenal exercise of the power to regulate the franchise.'" *Id.* at 450 (quoting *Trop v. Dulles*, 356 U.S. 86, 97 (1958) (plurality opinion)). Second, *Green* held that "if it were a punishment," it is not cruel and unusual. *Ibid.* The court explained that 11 state constitutions "adopted between 1776 and 1821 prohibited or authorized

the legislature to prohibit exercise of the franchise by convicted felons," 29 States had such provisions when the Fourteenth Amendment was adopted, and 42 States had them by 1967. *Ibid.* "[T]he great number of states excluding felons from the franchise forbids a conclusion that this is a 'cruel and unusual punishment' within the context of 'evolving standards of decency that mark the progress of a maturing society.'" *Id.* at 451 (quoting *Trop*, 356 U.S. at 101 (plurality opinion)). The Second Circuit deemed this Eighth Amendment claim so "lack[ing]" in "substance" that it "did not" even "state a substantial federal claim." *Id.* at 448, 452. *Green* squarely conflicts with the panel decision here, which holds that felon disenfranchisement is a punishment (Op. 28-32) and that it is cruel and unusual (Op. 32-44).

2. The panel decision also conflicts with the Eleventh Circuit's decision in *Thompson v. Alabama*, 65 F.4th 1288 (11th Cir. 2023). *Thompson* applied Supreme Court precedent (including *Smith v. Doe*) to conclude "that Alabama's disenfranchisement law, which has a history and structure very similar to ... Mississippi's, was nonpenal" and so comports with the Ex Post Facto Clause. Diss. 60; *compare* 65 F.4th at 1304-08 (assessing Alabama law's intent and purpose) *with supra* pp. 7-9 (same for Section 241). The Eleventh Circuit would reject the view that Section 241 imposes punishment subject to the Eighth Amendment.

## C.  The Panel Decision Raises Questions Of Exceptional Importance.

The panel decision raises issues of major legal and practical importance.

The panel invalidated in core applications a decades-strong state constitutional provision that this Court recently upheld en banc. The decision strips Mississippi of a power that the Constitution expressly recognizes that it possesses. That power is singularly important: it concerns who may participate in making the State's laws. Whenever a court invalidates a state law the matter is important. *See*, *e.g.*, *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers). Here it is especially so. The panel condemned a constitutional provision of wide impact that the people of Mississippi adopted by wide margins. It did so based on the "independent judgment" of just two judges—a judgment that departs from that of most Mississippi citizens and the citizens of many other States. If "independent judgment" is to decide Section 241's fate, that judgment should come from the full Court.

The panel decision, if left to stand, will have profound practical ramifications and be deeply destabilizing. The decision could materially affect elections in Mississippi: tens of thousands more people may be able to vote if the panel decision takes effect. *Cf.* ROA.19-60662.917. The decision also produces nationwide uncertainty. The ruling casts doubt on

14

the permanent-disenfranchisement laws that nearly a third of the States have, *see* Op. 45-51 (appendix), throws open to question the many state laws disenfranchising felons who are in prison, Diss. 65, and "provide[s] fodder" for attacking other consequences that have long flowed from felony convictions, Diss. 66 & n.11. And the decision sows immediate on-the-ground confusion in Mississippi. The decision scraps Mississippi law, encourages class members to risk committing a felony by unlawfully registering to vote when the panel decision may later be rejected (Miss. Code Ann. § 97-13-25), and directs the district court to enter sweeping relief under an unprincipled standard.

In *Richardson* the Supreme Court granted certiorari when a lower court struck down a permanent-disenfranchisement law under the Fourteenth Amendment. The panel here did the same thing and its decision warrants further review for the same reasons. Indeed, two years ago this Court took en banc a case challenging the same provision the panel invalidated here. This Court went en banc even though the panel had upheld that provision and it raised no circuit conflict. Plaintiffs here later told the U.S. Supreme Court that "[t]he constitutionality of Mississippi's criminal disenfranchisement scheme merits careful consideration by this Court." Hopkins Plaintiffs' Amicus Br. 3, *Harness v. Watson*, S. Ct. No. 22-412. The panel decision here is a stronger case

for further review than *Harness* was. The decision here *invalidates* the same constitutional provision—a ruling that is not on par with upholding a state law—and threatens sweeping chaos. When combined with the panel majority's departures from Supreme Court, Fifth Circuit, and other circuits' precedents, the case for rehearing en banc is overwhelming.

## CONCLUSION

This Court should grant rehearing en banc.

Respectfully submitted,

LYNN FITCH
  Attorney General

*s/ Justin L. Matheny*

SCOTT G. STEWART
  Solicitor General
JUSTIN L. MATHENY
ANTHONY M. SHULTS
  Deputy Solicitors General
MISSISSIPPI ATTORNEY
  GENERAL'S OFFICE
P.O. Box 220
Jackson, MS 39205-0220
Telephone: (601) 359-3680
E-mail: justin.matheny@ago.ms.gov
*Counsel for Defendant-Appellant*

August 18, 2023

## CERTIFICATE OF SERVICE

I, Justin L. Matheny, hereby certify that the foregoing petition has been filed with the Clerk of Court using the Court's electronic filing system, which sent notification of such filing to all counsel of record.

Dated: August 18, 2023

*s/ Justin L. Matheny*
Justin L. Matheny
*Counsel for Defendant-Appellant*

## CERTIFICATE OF COMPLIANCE

This petition complies with the word limitations of Fed. R. App. P. 35(b)(2)(a) because it contains 3767 words, excluding parts exempted by Fed. R. App. P. 32(f). This petition complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because its text has been prepared in proportionally spaced typeface, including serifs, using Microsoft Word 2016, in Century Schoolbook 14-point font.

Dated: August 18, 2023

*s/ Justin L. Matheny*
Justin L. Matheny
*Counsel for Defendant-Appellant*

# APPENDIX

*Hopkins v. Hosemann*, No. 19-60662 c/w No. 19-60678
(Aug. 4, 2023)

# United States Court of Appeals
# for the Fifth Circuit

United States Court of Appeals
Fifth Circuit

**FILED**

August 4, 2023

Lyle W. Cayce
Clerk

No. 19-60662
CONSOLIDATED WITH
No. 19-60678

DENNIS HOPKINS, *individually and on behalf of a class of all others similarly situated*; HERMAN PARKER, JR., *individually and on behalf of a class of all others similarly situated*; WALTER WAYNE KUHN, JR., *individually and on behalf of a class of all others similarly situated*; BRYON DEMOND COLEMAN, *individually and on behalf of a class of all others similarly situated*; JON O'NEAL, *individually and on behalf of a class of all others similarly situated*; EARNEST WILLHITE, *individually and on behalf of a class of all others similarly situated*,

*Plaintiffs—Appellees*,

*versus*

SECRETARY OF STATE DELBERT HOSEMANN, *in his official capacity*,

*Defendant—Appellant*,

Appeal from the United States District Court
for the Southern District of Mississippi
No: 3:18-CV-188

Before KING, JONES, and DENNIS, *Circuit Judges*.

JAMES L. DENNIS, *Circuit Judge*:

No. 19-60662
c/w No. 19-60678

In this class action, Plaintiffs, representing persons who have been convicted of certain crimes and have completed the terms of their sentences, challenge their disenfranchisement by two provisions of Article XII of the Mississippi Constitution of 1890. The first provision, Section 241, mandates permanent, lifetime disenfranchisement of a person convicted of a crime of any one of "murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy."[1] The second, Section 253, provides for a discretionary, standardless scheme for the Mississippi Legislature to restore the right to vote to disenfranchised persons on an individualized basis by a two-thirds vote of all members of each house of the Legislature.

Plaintiffs sued Mississippi's Secretary of State (the "Secretary"), contending that Section 241 violates the Eighth Amendment's prohibition on cruel and unusual punishment and the Fourteenth Amendment's guarantee of equal protection under the law. They also claim that Section 253 violates the Fourteenth Amendment's guarantee of equal protection of the laws and the First Amendment guarantee of freedom of speech. The Secretary responded that Plaintiffs lack Article III standing, that their claims are barred by the doctrine of state sovereign immunity, and that all of their claims fail on their merits.

For the reasons explained below, we hold that Plaintiffs are entitled to prevail on their claim that, as applied to their class, disenfranchisement for life under Section 241 is unconstitutional cruel and unusual punishment

---

[1] The Mississippi Secretary of State, the defendant here, is required by statute to treat additional crimes that the Mississippi Attorney General deems to be a species of the common law crimes listed in Section 241. *See* MISS. CODE. § 23-15-151. For instance, timber larceny, armed robbery, and larceny under a lease agreement are all deemed by the Attorney General as disenfranchising crimes though they are not expressly listed in Section 241.

No. 19-60662
c/w No. 19-60678

within the meaning of the Eighth Amendment. In the last fifty years, a national consensus has emerged among the state legislatures against permanently disenfranchising those who have satisfied their judicially imposed sentences and thus repaid their debts to society. Today, thirty-five states plus the District of Columbia disavow the practice embodied in Section 241, a supermajority whose size is dispositive under controlling Supreme Court precedent. Mississippi stands as an outlier among its sister states, bucking a clear and consistent trend in our Nation against permanent disenfranchisement. And in our independent judgment—a judgment under the Eighth Amendment that the Supreme Court requires we make—Section 241's permanent disenfranchisement serves no legitimate penological purpose. By severing former offenders from the body politic forever, Section 241 ensures that they will never be fully rehabilitated, continues to punish them beyond the term their culpability requires, and serves no protective function to society. It is thus a cruel and unusual punishment.

We accordingly reverse the district court's contrary ruling, render judgment for Plaintiffs on this claim, and remand the case with instructions that the district court grant relief declaring Section 241 unconstitutional and enjoining the Secretary from enforcing Section 241 against the Plaintiffs and the members of the class they represent. Plaintiffs' equal protection claim against the Secretary with respect to Section 241, however, is foreclosed by the Supreme Court's decision in *Richardson v. Ramirez*, 418 U.S. 24 (1974). Additionally, Plaintiffs lack standing to challenge the legislative process embodied in Section 253 through this action.

## I.     Factual and Procedural Background

### A.     Mississippi's 1890 Constitution and Sections 241 and 253

Sections 241 and 253 of the Mississippi Constitution are, with the exception of several amendments to Section 241, original to the state's 1890

No. 19-60662
c/w No. 19-60678

Constitution, which was adopted in reaction to the expansion of black suffrage and other political rights during Reconstruction. *See Harness v. Watson*, 47 F.4th 296, 300 (5th Cir. 2022) (en banc). After wresting control of state government from black leaders and their Republican allies through a campaign of violence and electoral fraud, Mississippi's white political leadership called for a new state constitution that would ensure "a home government, under the control of the white people of the State." *Senator J. Z. George, He Addresses a Large Audience at His Old Home*, The Clarion-Ledger (Jackson) 1 (Oct. 24, 1889). In 1890, the state legislature voted to convene a constitutional convention in order to draft and adopt a new state constitution. From the outset, the object of the 1890 Mississippi Constitutional Convention was clear: to ensure the political supremacy of the white race. *See Harness*, 47 F.4th at 318 (Graves, J. dissenting). Key to accomplishing this end was a package of "voter qualifications and procedures" that delegates adopted "to exclude black citizens from participation in the electoral process." *Miss. State Chapter, Operation Push v. Allain*, 674 F. Supp. 1245, 1251 (N.D. Miss. 1987), *aff'd*, 932 F.2d 400 (5th Cir. 1991).

Although the delegates were explicit about their goal of white political control, they were careful to avoid provisions overtly violating the Fifteenth Amendment's ban on restricting voting based on race. Convention's Committee on the Elective Franchise (the "Franchise Committee") thus proposed voter qualification requirements that were facially race neutral. These included the kind of poll taxes, literacy tests, and residency requirements that were common in the American South during the post-Reconstruction era. Among these requirements was also a criminal disenfranchisement provision that remains today as Section 241 of the Mississippi Constitution. The measure was designed to target as disenfranchising offenses those that the white delegates thought were more often committed by black men. *Harness*, 47 F.4th at 300; *Ratliff v. Beale*, 20 So. 865, 868–69 (Miss. 1896) (explaining that

in enacting Section 241 the Convention aimed to "obstruct the exercise of the franchise by the negro race" by including as disenfranchising offenses only those "to which its weaker"—by which the court meant "black"—"members were prone.").

The possibility that the disenfranchisement provisions might ensnare not only black men but also poor white males caused concern at the Convention. So, in an effort to mitigate the fear that the disenfranchisement provisions would also affect whites, the Convention ratified several "escape" clauses. For example, to reduce the impact of literacy tests on poor white males, the Convention enacted the "Understanding Clause," a provision that allowed a voter to pass a "constitutional interpretation test" by giving a "reasonable interpretation" of the state constitution. The Franchise Committee justified this "Understanding Clause" on the grounds that it would "exclude . . . [n]o white man who has sense enough to go to the mill," and urged that the clause would "secure[] a white basis upon which to erect a permanent State government." *Don't Like It But Takes It*, The Clarion-Ledger (Jackson) 1 (Oct. 9, 1890).

Another of the escape clauses was the suffrage restoration provision that is contained in Section 253. Section 253 allows the Mississippi Legislature to, by a two-thirds vote of the elected members of both houses, restore the voting rights of any person disenfranchised by Section 241. Miss. Const. art. XII, § 253. While the record behind the enactment of Section 253 is scant, its timing and context suggest it was intended to limit the impact of Section 241's criminal disenfranchisement provision on white men, providing a limited "safety net" to allow any whites unintentionally disenfranchised by Section 241 to escape its effects. And, like the Understanding Clause, Section 253 includes no objective standards of any kind, allowing legislators unfettered discretion in restoring the franchise to individuals.

No. 19-60662
c/w No. 19-60678

Mississippi's 1890 Constitution was adopted by a vote of the delegates on November 1, 1890, without ratification by the people of Mississippi. Other Southern states took notice of Mississippi's "success" in disenfranchising its black electorate and used the State's 1890 Constitution as a model when adopting their own racial disenfranchisement provisions. *See* Franita Tolson, *What Is Abridgment? A Critique of Two Section Twos*, 67 ALA. L. REV. 433, 469–71 (2015) (noting that South Carolina and North Carolina adopted constitutional disenfranchisement provisions in an effort to limit the black electorate).

Since its enactment, Section 241 has been amended twice. *Harness*, 47 F.4th at 300. In 1950, "burglary" was removed from the list of disenfranchising crimes, and in 1968, "murder" and "rape" were added—the latter offenses having been historically excluded because they were not considered crimes a black person was prone to commit. *See Ratliff*, 20 So. at 868. Under Section 241, an individual who is convicted of a crime as minor as writing a bad check for $100 or stealing less than $250 worth of timber is permanently disenfranchised. MISS. CODE § 97-19-67(1)(d); § 97-17-59.

Section 253 has never been amended, and, with the exception of gubernatorial pardon and the limited restoration for certain World War I and II veterans, it remains the only means for disenfranchised individuals to regain the right to vote. In the mid-1980s, an election law task force appointed by the Mississippi Secretary of State and two separate panels convened by the Mississippi Legislature proposed repealing Section 253 and replacing it with an amendment that would automatically restore the right to vote to individuals convicted of disenfranchising crimes upon completion of their sentences. The Legislature, however, ultimately did not adopt this proposal as part of an election law reform bill enacted in 1986.

No. 19-60662
c/w No. 19-60678

Sections 241 and 253 continue to be part of the Mississippi Constitution and over the years they have been remarkably effective in achieving their original, racially discriminatory aim. In 2017, 36% of voting-age citizens in Mississippi were black. Yet, according to data provided by the Mississippi Administrative Office of the Courts, of the nearly 29,000 Mississippians who were convicted of disenfranchising offenses and have completed all terms of their sentences between 1994 and 2017, 58%—or more than 17,000 individuals—were black. Only 36% were white. The discretionary legislative re-enfranchisement permitted by Section 253 does little to alleviate this disproportionate burden, and, as a practical matter, legislative suffrage is exceedingly rare: between 2013 and 2018, the Mississippi Legislature restored the right to vote to only eighteen individuals.

**B.     The Secretary's Role in Enforcement of Sections 241 and 253**

Federal law requires that each state designate a chief election official who is "responsible for coordination" of the state's duties under the National Voter Registration Act ("NVRA"). 52 U.S.C. § 20509; *see also* Voluntary Guidance on Implementation of Statewide Voter Registration Lists, Election Assistance Comm'n, 70 Fed. Reg. 44593-02, 44594 (Aug. 3, 2005) ("The chief State election official is the highest ranking State official who has, as a primary duty, the responsibility to ensure the lawful administration of voter registration in Federal elections."). In Mississippi, the Secretary of State performs this role. Miss. Code § 23-15-211.1(1). The Secretary is charged by state law with establishing the instructions and application form for voter registration. *Id*. §§ 23-15-39(1), 23-15-47(3). Each municipality's clerk, in her capacity as the local registrar of voters, is in turn required to "use [the] voter registration applications . . . prescribed by the Secretary of State" when registering voters. *Id*.§ 23-15-35(1).

No. 19-60662
c/w No. 19-60678

The current Mississippi voter registration application form, as adopted by the Secretary, states that individuals convicted of certain crimes in a Mississippi state court are not eligible to register to vote. The form requires an applicant to affirm, on penalty of perjury, that he or she has either "never been convicted of voter fraud or any other disenfranchising crime" or has had their voting rights restored. The Secretary is also tasked by state statute with "implement[ing] and maintain[ing]" an electronic information processing system containing a "centralized database of all registered voters in the state." *Id*. § 23-15-165(1). This system, referred to as the Statewide Elections Management System ("SEMS"), is updated by each county's circuit clerk on a quarterly basis with a list of persons convicted of any disenfranchising crime under Section 241; these persons are then purged from the voter rolls in the database. *Id*. § 23-15-151.

Finally, the Secretary serves on the State Board of Election Commissioners and is responsible in that capacity for training county election commissioners on voter roll maintenance, including the use of SEMS to remove disqualified electors from voting rolls. *Id*. § 23-15-211(4). After an elections commissioner completes annual training, the Secretary provides the commissioner with a certificate that is required for the commissioner to maintain office. *Id.* §§ 23-15-211(4)–(5) (providing that election commissioners are required to attend the Secretary's elections seminars, upon completion of which they are to receive a certificate that must be renewed yearly).

In sum, the Secretary is Mississippi's "chief election officer" and performs key functions in administering and enforcing state election laws, including by (1) establishing voter registration instructions and application forms, which state that a person convicted of any disenfranchising crime is ineligible to vote; (2) administering the SEMS registered voter database; and (3) training county election officials through mandatory seminars on their obligation to purge SEMS of ineligible voters and then certifying these officials.

No. 19-60662
c/w No. 19-60678

## C.    Proceedings Below

In 2018, six permanently disenfranchised Mississippi citizens filed this putative class-action lawsuit in federal district court, asserting five federal constitutional challenges to Sections 241 and 253. Plaintiffs, who were convicted of various crimes and have completed all terms of their sentences, sued the Secretary in his official capacity, requesting declaratory and injunctive relief for claimed violations of the First, Eighth, and Fourteenth Amendments of the United States Constitution. Dennis Hopkins, a grandfather and founder of a local peewee football team, has been disenfranchised since 1998 when he was convicted of grand larceny. Herman Parker Jr., a public employee with over a decade of service working for the Vicksburg Housing Authority, is disenfranchised for life because he was convicted of grand larceny at the age of nineteen. And Byron Demond Coleman lost his right to vote in 1997 when he was convicted of receiving stolen property after buying some refurbished appliances. The district court certified Plaintiffs' proposed class, allowing Plaintiffs to represent persons in the state who have been convicted of a Section 241 disenfranchising offense and who have completed all terms of their sentences.

Plaintiffs and the Secretary filed cross-motions for summary judgment. The Secretary contended that Plaintiffs lacked standing, that their suit was barred by sovereign immunity, and that the claims failed on their merits. The district court rejected the Secretary's jurisdictional arguments, holding that Plaintiffs had standing to bring each of their claims and that the Secretary was amenable to a suit seeking equitable relief under *Ex parte Young*. But, on the merits, the district court granted summary judgment to the Secretary except as to Plaintiffs' Section 253 race-based equal protection claim. On this latter claim only, the court ruled that "questions of fact" remained as to whether Plaintiffs "met their burden" under controlling precedent. The court then certified its order for interlocutory appeal.

No. 19-60662
c/w No. 19-60678

The parties filed timely cross-petitions with this court seeking permission to file an interlocutory appeal. This court granted both petitions and consolidated the appeals.

## II.    Legal Standard

We review an order on summary judgment *de novo*, applying the same standard as applicable to the district court. *Castellanos-Contreras v. Decatur Hotels, LLC*, 622 F.3d 393, 397 (5th Cir. 2010). Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

## III.    Discussion

On appeal, Plaintiffs argue that: (1) the district court properly held that Article III standing was satisfied as to all claims, (2) the *Ex parte Young* exception to sovereign immunity allows all claims to be brought against the Secretary; (3) Section 241's lifetime voting ban infringes on the fundamental right to vote, is therefore subject to strict scrutiny, and cannot satisfy such demanding review; (4) Section 241's lifetime disenfranchisement violates the Eighth Amendment's prohibition on cruel and unusual punishment because it is punitive and contrary to contemporary standards of decency; (5) Section 253, the suffrage restoration provision, violates the Equal Protection Clause because it authorizes legislators to arbitrarily restore (or not restore) the right to vote to some citizens rather than others, its enactment in 1890 was motivated by racial animus, and it disproportionately impacts black Mississippians today; and (6) Section 253 violates the First Amendment because legislators are given the power to exercise "unfettered discretion" in

No. 19-60662
c/w No. 19-60678

determining who can express their constitutionally-protected political views by voting.[2]

In response, the Secretary contends that (1) Plaintiffs lack Article III standing and sovereign immunity bars their claims; (2) the Supreme Court's decision in *Richardson v. Ramirez*, which upheld California's permanent felon disenfranchisement scheme against an equal protection challenge, forecloses Plaintiffs' equal protection claim; (3) Section 241 cannot violate the Eighth Amendment because *Richardson* precludes an Eighth Amendment challenge to permanent disenfranchisement and because Section 241 does not impose "punishment" within the meaning of the Eighth Amendment; (4) Section 253's discretionary procedures for restoration of the franchise do not violate equal protection under Supreme Court precedent because Plaintiffs failed to demonstrate that Section 253 was enacted with a discriminatory motive and currently has a racially disproportionate impact; and (5) Section 253 does not run afoul of the First Amendment because the First Amendment does not afford greater protection for voting rights than that already provided by the Fourteenth Amendment.

We address these arguments in turn, starting as we must with the question of standing.

## A. Article III Standing

The district court denied the Secretary's motion for summary judgment based on lack of standing, concluding that Plaintiffs have standing to bring all their claims—the equal protection and Eighth Amendment

---

[2] Plaintiffs did not offensively petition this Court for permission to appeal the question of whether a standardless re-enfranchisement law violates the First Amendment. Plaintiffs included defensive argument on this issue because it was raised by the Secretary in his briefing and in the event it is reached by the Court.

challenges to Section 241, as well as the equal protection and First Amendment challenges to Section 253.

Article III of the Constitution limits the exercise of federal judicial power to "Cases" and "Controversies." *See Spokeo, Inc. v. Robins*, 578 U.S. 330, 337 (2016) (citing U.S. Const. art. III, § 2). The doctrine of standing "is an essential and unchanging part of the case-or-controversy requirement of Article III." *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992).

To establish Article III standing, (1) Plaintiffs must have suffered an "injury in fact" that is "concrete and particularized" and "actual or imminent"; (2) "the injury has to be fairly traceable to the challenged action of the defendant"; and (3) "it must be likely . . . that the injury will be redressed by a favorable decision." *Id.* at 560–61 (cleaned up). Plaintiffs, as the party invoking federal jurisdiction, "bear[] the burden of establishing these elements." *Id.* at 561. Furthermore, "'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." *Davis v. Fed. Election Comm'n*, 554 U.S. 724, 734 (2008) (quoting *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352 (2006)). We review questions of standing *de novo. Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 343 (5th Cir. 2013).

Considering Plaintiffs' standing to assert their various challenges to each of the provisions at issue, we hold that Plaintiffs have demonstrated their standing to pursue their Section 241 claims but not their Section 253 claims.

### 1.    Section 241

Plaintiffs challenge the permanent disenfranchisement provision of Section 241 on the grounds that it violates the Equal Protection Clause of the Fourteenth Amendment and the Eighth Amendment's prohibition of cruel and unusual punishment. The district court concluded that the Secretary's

No. 19-60662
c/w No. 19-60678

statutory duties managing a statewide computerized election management system and his designation as the state's chief elections officer established that "Plaintiffs' injuries are sufficiently traceable to and redressable by" the Secretary. The Secretary disagrees, arguing that because he merely provides information to local officials who administer elections regarding disqualified voters, Plaintiffs' injuries cannot be traced to nor redressed by him.

The district court disagreed, as do we. Plaintiffs' injuries stemming from Section 241 are fairly traceable to the Secretary. Designated by federal law as Mississippi's chief election officer, the Secretary is tasked with developing mail voter application forms, 52 U.S.C. § 20508(a)(2), and, under Mississippi law, is responsible for establishing the instructions and application form for voter registration. *See* Miss. Code §§ 23-15-39(1), 23-15-47(3). The current Mississippi voter registration application and form, as established by the Secretary, states that a person convicted of any disenfranchising crime in a Mississippi court is ineligible to vote and requires that an applicant affirm that they have never been convicted of such a crime on penalty of perjury. Municipal clerks are statutorily required to use an application form evidencing a disenfranchising conviction to deny registration as "prescribed by the Secretary." *Id.* § 23-15-35(1).

On this basis alone, Plaintiffs' injuries are fairly traceable to the Secretary's actions. By requiring individuals to declare, on penalty of perjury, that they have not been convicted of disenfranchising crimes, the voter registration application that the Secretary developed prohibits individuals convicted of disenfranchising crimes from lawfully completing the application form that is needed in order to vote. *See Tex. Democratic Party v. Abbott*, 978 F.3d 168, 178 (5th Cir. 2020) (Secretary's duty to design mail-in-ballot sufficient to confer standing on voters denied the right to vote by mail because of age).

No. 19-60662
c/w No. 19-60678

But the Secretary's duties do not end there. The Secretary is also tasked with "implementing and maintaining" the SEMS database. Miss. Code § 23-15-165(1). SEMS "constitute[s] the official record of registered voters in every county of the state," and therefore plays an essential component in purging from the voter rolls individuals convicted of a disenfranchising crime. *Id.* For example, SEMS is updated quarterly with a list of individuals convicted of disenfranchising offenses. *Id.* § 23-15-151. And the Secretary has the statutory responsibility to train local elections officials to use SEMS to filter out disenfranchised individuals from the SEMS voter database. *Id.* § 23-15-211(4). Indeed, local elections commissioners can only be certified as such after attending the Secretary's annual training, in which he instructs them to purge the voter rolls. *Id.* §§ 23-15-211(4)-(5). Though local officials may be the ones to ultimately remove ineligible voters from their voter rolls, they do so based on an eligibility determination made by the Secretary and in accordance with training from his office. The Secretary's conduct need not be the proximate cause of a voter's disenfranchisement in order for the denial of the right to vote to be fairly traceable to him. *Bennett v. Spear*, 520 U.S. 154, 168–69 (1997). When a voter is removed from the voter rolls by a local official acting on information and instructions provided by the Secretary and in accordance with training from his office, the voter's injury is fairly traceable to the Secretary.

Because of these duties, the Secretary is also in a position to redress Plaintiffs' alleged injuries. Were the Secretary enjoined from enforcing Section 241, as Plaintiffs seek, he could amend Mississippi's voter registration form to allow disenfranchised class members to register, cease entering the names of citizens disqualified under Section 241 into SEMS or, alternatively, train local election officials to disregard that information in SEMS in maintaining their local voter rolls.

In sum, "the Secretary of State ha[s] a role in causing the claimed injury and is in a position to redress it at least in part. That is enough to confer standing to the voter plaintiffs to sue the Secretary." *Tex. Democratic Party*, 978 F.3d at 178. *See also Harness v. Hosemann*, 988 F.3d 818, 821 (5th Cir. 2021) (finding standing to sue the Secretary for enforcing Section 241), *reh'g en banc granted, opinion vacated*, 2 F.4th 501 (5th Cir. 2021), *and on reh'g en banc affirmed sub nom. Harness v. Watson*, 47 F.4th 296 (5th Cir. 2022).

## 2. Section 253

Plaintiffs also challenge Section 253 of Mississippi's Constitution, contending that that provision violates the First Amendment and the Fourteenth Amendment's Equal Protection Clause. The district court stated that the Secretary's role in Section 253 is "slight," but nevertheless found that Plaintiffs "minimally demonstrated standing" with respect to these claims because the Secretary is Mississippi's "chief election officer and maintains SEMS, which would presumably be involved in one of the final steps in returning a convicted felon to the voting rolls after he or she successfully files a section 253 petition." Since the Secretary had "some connection with the enforcement of the act," the district court concluded that Plaintiffs had standing to sue.

We observe that Plaintiffs characterize their injury not as the Secretary's implementation and enforcement of Section 253 but instead as the "unconstitutional burden" the provision places on individuals seeking to regain the right to vote through the passage of a suffrage bill. More specifically, this burden is having to petition the Legislature for a suffrage bill and then navigate the standardless and arbitrary process to pass the bill. This legislative process that Plaintiffs challenge begins and ends without the Secretary's involvement. The Secretary, in his official capacity, does not sponsor, draft, debate, vote on, or otherwise officially impact the passage or denial of a

suffrage restoration bill under Section 253. True, the Secretary will enforce any suffrage bill the Legislature happens to pass. But Plaintiffs' issue is not with the enforcement of any particular suffrage bill or suffrage bills generally, but with the Legislature's caprice in failing to enact them in the first place. Thus, the injury Plaintiffs complain of—the legislative process for restoration of the franchise—is not fairly traceable to the Secretary but instead is "the result of the independent action of some third party not before the court." *Lujan,* 504 U.S. at 560 (cleaned up). Accordingly, although Plaintiffs have established standing as to their claims against Section 241, they lack standing as to their claims against Section 253.

## B.   Sovereign Immunity

There is one final jurisdictional matter: Eleventh Amendment sovereign immunity, which the Secretary contends bars Plaintiffs' challenge to Section 241. The Eleventh Amendment generally precludes private suits against nonconsenting states in federal court. *City of Austin v. Paxton*, 943 F.3d 993, 997 (5th Cir. 2019). Sovereign immunity extends to suits against state officials that are, in effect, a suit against a state. *Id.* (citing *Edelman v. Jordan*, 415 U.S. 651, 663–69 (1974)). However, under the equitable exception to Eleventh Amendment immunity established in *Ex parte Young*, 209 U.S. 123, 155–56 (1908), a plaintiff may bring suit for injunctive or declaratory relief against a state official, in her official capacity, to "enjoin enforcement of a state law that conflicts with federal law." *Air Evac EMS, Inc. v. Tex. Dep't of Ins.*, 851 F.3d 507, 515 (5th Cir. 2017). Our court has observed that there is a "significant[] overlap" between the "Article III standing analysis and *Ex parte Young* analysis." *City of Austin*, 943 F.3d at 1002 (quoting *Air Evac EMS, Inc.*, 851 F.3d at 520).

Whether the Secretary is subject to suit under the *Ex parte Young* exceptions first depends upon whether the "complaint alleges an ongoing

No. 19-60662
c/w No. 19-60678

violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n of Md.*, 535 U.S. 635, 645 (2002). Plaintiffs' complaint alleges that the enforcement of Section 241 continues to wrongfully deprive them of the franchise in violation of the Eighth and Fourteenth Amendments and prays for declaratory and injunctive relief to stop the ongoing violation of their rights. Plaintiffs' complaint thus requests relief that is permissible under *Ex parte Young*.

The next inquiry concerns whether the defendant, "by virtue of his office, has some connection with the enforcement" of Section 241. *Ex parte Young*, 209 U.S. at 157. Without this requisite connection, the suit "is merely making [the state officer] a party as a representative of the state, and thereby attempting to make the state a party." *Id.* Although "[t]his circuit has not spoken with conviction" regarding the precise scope of the connection required under *Ex parte Young*, a sufficient connection certainly exists when there exists a "'special relationship' between the state actor and the challenged" provision. *Tex. Democratic Party*, 978 F.3d at 179 (quoting *K.P. v. LeBlanc*, 627 F.3d 115, 123 (5th Cir. 2010)). This standard is met here.

As explained in our standing analysis regarding Section 241 *supra*, the Secretary is charged under state law with establishing the instructions and application form for voter registration, and the form that the Secretary has developed specifically states that persons convicted of disenfranchising offenses are ineligible to vote. Further, state law requires the Secretary to develop and implement SEMS, which is "the official record of registered voters in every county of the state," Miss. Code § 23-15-165(1), and to train local elections officials to use SEMS to purge disenfranchised persons from the SEMS voter database. *Id.* § 23-15-211(4). Although local elections officials may also play a role in the disenfranchisement process, this does not alter or reduce the Secretary's clear connection to the enforcement of Section 241.

No. 19-60662
c/w No. 19-60678

Because Plaintiffs have standing to pursue their Section 241 claims and because the *Ex parte Young* exception to state sovereign immunity applies, we have jurisdiction over Plaintiffs' appeal. We therefore proceed to the merits of their challenges to Section 241.

### C.    Equal Protection Challenge to Section 241

Plaintiffs contend that permanent disenfranchisement under Section 241 of the Mississippi Constitution violates the Equal Protection Clause of the Fourteenth Amendment. This claim, Plaintiffs acknowledge, must be reconciled with the Supreme Court's decision in *Richardson v. Ramirez*. 418 U.S. 24 (1974).

In *Richardson*, former felons who had completed all terms of their court-imposed sentences challenged a set of California laws that permanently disenfranchised any person convicted of an "infamous crime" unless and until the person obtained a court order or executive pardon that restored the franchise. *Id*. at 26–27. The plaintiffs argued that, when applied to a class of felons whose terms of incarceration and parole had expired, California's permanent disenfranchisement scheme violated the Equal Protection Clause by burdening a fundamental right without a compelling state interest. *Id.* at 27. In considering the plaintiffs' claim, the Supreme Court looked not only to Section 1 of the Fourteenth Amendment, where the Equal Protection Clause is located, but also to the "less familiar" Section 2 of that Amendment. *Id.* at 42. Section 2 provides, in relevant part:

> [W]hen the right to vote . . . is denied . . . or in any way abridged, except for participation in rebellion, or other crime, the basis of [a State's] representation [in Congress] . . . shall be reduced in the proportion which the number of such [disenfranchised] citizens shall bear to whole number of [citizens eligible to vote in that state].

U.S. CONST. amend. XIV, § 2. Thus, Section 2 of the Fourteenth Amendment imposes a penalty of reduced congressional representation on states that deny or abridge the right to vote for reasons other than "participation in rebellion, or other crime." *Id.*

The Court ultimately rejected the plaintiffs' challenge, relying primarily on Section 2. The Court pointed out that the phrase "except for participation in rebellion, or other crime" (the "other crime" exception) exempted states like California that disenfranchised their citizens because of felony convictions from the amendment's sanction of reduced representation. *Id.* at 55. From this observation, the Court posited that "those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in [the Equal Protection Clause of Section] 1 of that Amendment, that which was expressly exempted from the lesser sanction of reduced representation by [Section] 2 of the Amendment." *Id.* at 43. In light of the "affirmative sanction" for "the exclusion of felons from the vote in [Section] 2 of the Fourteenth Amendment," the Court held that California laws permanently disenfranchising "convicted felons who have completed their sentences and paroles" did not violate the Equal Protection Clause. *Id.* at 56. Under binding Supreme Court precedent, then, state laws that permanently disenfranchise convicted felons are not *per se* unconstitutional on equal protection grounds.[3]

---

[3] Although we are bound by the Supreme Court's holding in *Richardson*, we do not contend here that the *Richardson* majority's reading of Section 2 is the only plausible interpretation of the provision. Justice Marshall, dissenting in *Richardson*, forcefully argued that the disenfranchisement of ex-felons must withstand the requirements of the Equal Protection Clause because neither the fact that multiple States "had felon disenfranchisement laws at the time of the adoption of the Fourteenth Amendment, nor that such disenfranchisement was specifically excepted from the special remedy of [Section 2], can serve to insulate such disenfranchisement from equal protection scrutiny."

No. 19-60662
c/w No. 19-60678

Despite *Richardson*'s holding, Plaintiffs urge that it does not foreclose their equal protection claim. They advance what they characterize as a novel textualist argument that was not raised in *Richardson*—that Section 2's "other crime" exception to reduced representation applies only when laws *temporarily* "abridge" the right to vote and does not apply when laws, like Section 241 of Mississippi's Constitution, *permanently* "deny" the franchise. Plaintiffs thus argue that permanent felon disenfranchisement is not "expressly exempted" from Section 2's representation penalty, and, therefore, *Richardson*'s determination that the Equal Protection Clause in Section 1 does not prohibit felon disenfranchisement laws is inapplicable. *Id.* at 43.

Though Plaintiffs do not expressly ask us to overrule *Richardson*—a power we undoubtedly lack, *Ballew v. Cont'l Airlines, Inc.*, 668 F.3d 777, 782 (5th Cir. 2012)—their argument calls for us to invalidate on equal protection grounds a state law authorizing permanent disenfranchisement of persons convicted of certain crimes. But that is precisely the type of law the *Richardson* Court expressly upheld against an equal protection attack. The California laws the *Richardson* plaintiffs challenged were not temporarily abridging disenfranchisement laws, but permanent ones like the Mississippi law challenged here. *See Richardson*, 418 U.S. at 27–28 ("At the time respondents were refused registration" . . . the California Constitution provided that no person convicted of an infamous crime "shall *ever* exercise the privileges of an elector in this State.") (emphasis added). *Richardson*, therefore, applied Section 2's "other crime" exception to permanent disenfranchisement. Whether the Supreme Court majority thought California's permanent disenfranchisement was a "denial" of the right to vote or an "abridgment" is

---

*Richardson*, 418 U.S. at 74, 77 (Marshall, J., dissenting, joined by Brennan, J.) (concluding that Section 2 "was not intended and should not be construed to be a limitation on the other sections of the Fourteenth Amendment").

No. 19-60662
c/w No. 19-60678

immaterial. The Court clearly was of the opinion that California's constitutional and statutory scheme—which permanently disenfranchised individuals convicted of "infamous crimes"—fell within the "other crime" exception found in Section 2 of the Fourteenth Amendment. *See id.* at 54–55. The Court thus necessarily rejected an argument that the "other crime" exception applied only to temporary disenfranchisement.

In sum, as an "inferior court," U.S. Const. art. III, § 1, we are bound by the Supreme Court's decision in *Richardson*, *see Ballew*, 668 F.3d at 782, and therefore must conclude that Section 241 of Mississippi's Constitution does not violate the Equal Protection Clause by burdening this fundamental right.[4] The district court thus correctly granted summary judgment to the Secretary on this claim.

---

[4] Plaintiffs cite to several cases to support their contention that "[e]ven if the *Richardson* Court had assumed that the 'other crime' exception modifies the words 'is denied' as well as the phrase 'or in any way abridged,' the Supreme Court's unstated assumption does not foreclose consideration of this question." We find this argument unavailing. The cases cited by Plaintiffs stand for the proposition that legal questions neither raised before nor considered by a prior court do not constitute binding precedent. *See, e.g., Cooper Indus., Inc. v. Aviall Servs., Inc.*, 543 U.S. 157, 170 (2004) (refusing to rely on dictum in another case to resolve the plaintiff's alternative argument, which was not briefed by the plaintiff and which would have required the court to decide a question that was "a significant issue in its own right"); *Webster v. Fall*, 266 U.S. 507, 511 (1925) (explaining in a case where an indispensable party was not joined or added as a litigant that earlier decisions in which the Court reached the merits of a dispute despite the absence of an arguably necessary party could not serve as binding precedent on the requirement of such a party's presence because that issue had not been "suggested or decided" in the earlier cases); *Brecht v. Abrahamson*, 507 US 619, 631 (1993) (in considering whether the harmless-error standard of review applied in federal habeas cases, the Supreme Court reasoned that even though it was applied in such a manner in the past, its application "had never squarely addressed the issue," and therefore was "free to address [that] issue on the merits"). In the instant case, the legal question of whether state laws providing for permanent disenfranchisement of convicted felons violate equal protection has already been squarely passed upon by the Supreme Court. *See Richardson*, 418 U.S. at 24.

No. 19-60662
c/w No. 19-60678

### D.    Eighth Amendment Challenge to Section 241

Plaintiffs contend that permanent disenfranchisement by Section 241 is cruel and unusual punishment that violates the Eighth Amendment. Section 241 disenfranchisement begins upon a person's conviction of a Section 241 offense and continues for the rest of his life. The Eighth Amendment provides: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. Const. amend. VIII. "To determine whether a punishment is cruel and unusual, courts must look beyond historical conceptions to 'the evolving standards of decency that mark the progress of a maturing society' . . . 'The standard itself remains the same, but its applicability must change as the basic mores of society change.'" *Graham v. Florida*, 560 U.S. 48, 58 (2010) (first quoting *Estelle v. Gamble*, 429 U.S. 97, 102 (1976); then quoting *Kennedy v. Louisiana*, 554 U.S. 407, 418 (2008)). The district court failed to apply this standard to Section 241, concluding in error that Section 2 of the Fourteenth Amendment placed the practice of permanent felon disenfranchisement

---

Plaintiffs also point to the Ninth Circuit's treatment of felon disenfranchisement in *Harvey v. Brewer*, 605 F.3d 1067 (9th Cir. 2010), in which the plaintiffs challenged an Arizona statute that permanently disenfranchised convicted felons. The plaintiffs sought to "escap[e] *Richardson*'s long shadow" by contending that the "other crime" exception in Section 2 "only permit[ted] disenfranchisement for common-law felonies" and did not apply to statutory felonies. *Id.* at 1071, 1073–74 (9th Cir. 2010) (O'Connor, J., sitting by designation). The Ninth Circuit acknowledged that the plaintiffs' proposed reading of Section 2 was "in extreme tension with *Richardson*" given that the Supreme Court upheld a permanent felon disenfranchisement scheme without evincing any "concern with whether any particular felony was one recognized at common law." *Id.* at 1074, 1078 (quoting *Richardson*, 418 U.S. at 56). Nevertheless, since neither the Ninth Circuit nor the Supreme Court "ha[d] directly addressed this precise question"—the types of crimes within the ambit of Section 2's "other crime" exception—the court considered (and rejected) the merits of plaintiffs' argument. *Id.* at 1074. By contrast, Plaintiffs here ask this court to adopt a construction of Section 2 that is not merely in tension with *Richardson* but instead directly conflicts with that decision's holding. That we cannot do.

beyond the reach of the Eighth Amendment. We reverse the district court's entry of summary judgment for the Secretary. For the reasons hereinafter assigned, we instead render judgment for the plaintiffs declaring that permanent disenfranchisement inflicted by Section 241 of Article XII of the Mississippi Constitution is cruel and unusual punishment in violation of the Eighth Amendment.

## 1. *Richardson* Applied Only Equal Protection Precepts and Therefore Does Not Foreclose Plaintiffs' Eighth Amendment Claim

Before engaging in the Eighth Amendment analysis, we point out that the district court erred by omitting entirely to perform that assessment in the present case. Relying on the Supreme Court's decision in *Richardson*, the district court concluded that Plaintiffs' Eighth Amendment claim failed because it would be "internally inconsistent for the Eighth Amendment to prohibit criminal disenfranchisement while § 2 of the Fourteenth Amendment permits it." *Harness v. Hosemann*, No. 3:17-CV-791, 2019 WL 8113392, at *11 (S.D. Miss. Aug. 7, 2019). That was error. *Richardson* held only that permanent disenfranchisement did not violate the Equal Protection Clause of the Fourteenth Amendment by burdening a fundamental right without adequate justification. The Court did not consider or decide whether a permanent ban on felons' voting after they completely served their sentences violates the Eighth Amendment's prohibition on cruel and unusual punishment.

The Supreme Court has "rejected the view that the applicability of one constitutional amendment pre-empts the guarantees of another . . . The proper question is not which Amendment controls but whether either Amendment is violated." *United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 49–50 (1993). Though *Richardson* contemplated that felon disenfranchisement was implicitly authorized by Section 2 of the Fourteenth

No. 19-60662
c/w No. 19-60678

Amendment, "provisions that grant Congress or the States specific power to legislate in certain areas . . . are always subject to the limitation that they must not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29 (1968); *see also Soldal v. Cook Cnty., Ill.*, 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands."). Indeed, this fundamental principle of constitutional construction has been applied by the Supreme Court in circumstances squarely analogous to the case at bar. In *Hunter v. Underwood*, 471 U.S. 222, 227–29 (1985), the Court held that a provision of Alabama's Constitution that disenfranchised persons convicted of crimes "involving moral turpitude" violated the Equal Protection Clause in Section 1 of the Fourteenth Amendment because of the provision's racially discriminatory origins and impact. The Court explained that, despite the "implicit authorization of § 2 [of the Fourteenth Amendment] to deny the vote to citizens for 'participation in rebellion, or other crime,'" Section 2 did not "permit . . . purposeful racial discrimination" that "violates § 1 of the Fourteenth Amendment." *Id.* at 233 (internal citation omitted). "[W]e are confident that § 2 was not designed to permit the purposeful racial discrimination . . . which otherwise violates § 1 of the Fourteenth Amendment," the Court explained. *Id.* "Nothing in our opinion in *Richardson v. Ramirez*, *supra*, suggests the contrary." *Id.*

Further, there is no reason to think the Eighth Amendment's protections may, for some special reason, be nullified by the Constitution's countenancing a particular type of punishment. Courts, including ours, have recognized that the Eighth Amendment constrains states' power to impose "cruel and unusual" conditions of involuntary servitude on prisoners, despite the fact that the Thirteenth Amendment "specifically allows involuntary servitude as punishment after conviction of a crime." *Murray v.*

No. 19-60662
c/w No. 19-60678

*Miss. Dep't of Corr.*, 911 F.2d 1167, 1168 (5th Cir. 1990). Although the Thirteenth Amendment may authorize the state to impose work obligations on prisoners, "there are circumstances in which prison work requirements can constitute cruel and unusual punishment" in violation of the Eighth Amendment. *Ray v. Mabry*, 556 F.2d 881, 882 (8th Cir. 1977) (holding that prisoner stated an Eighth Amendment claim when he alleged that he was forced to work "90 to 120 hours per week;" "that he cannot do the hard labor assigned to him because he is physically disabled;" and "that he is constantly cursed and threatened by prison supervisors"); *see also Williams v. Henagan*, 595 F.3d 610, 622 n.18 (5th Cir. 2010) ("Prison work conditions may however, amount to cruel and unusual punishment.").

The district court erred in concluding that Section 2 of the Fourteenth Amendment's implicit authorization of permanent disenfranchisement settles all constitutional questions about the practice. Fundamental tenets of constitutional jurisprudence and on-point Supreme Court precedent makes clear that Section 2 does not override all other constitutional protections. Although the Fourteenth Amendment has been interpreted to implicitly authorize felon disenfranchisement, disenfranchisement schemes established under this authority must still be consonant with other constitutional commands, including those embodied in the Eighth Amendment. The protections to individual liberty and dignity afforded by each provision of the Constitution do not evaporate when one provision permits states to legislate in a certain field. "Obviously we must reject the notion that [Section 2], gives the States power to impose burdens on the right to vote, where such burdens are expressly prohibited in other constitutional provisions." *Rhodes*, 393 U.S. at 29.

Furthermore, *Richardson* only addressed an equal protection challenge to permanent disenfranchisement. It did not examine or rule upon an Eighth Amendment claim, as the present case requires. Whether a

punishment is "cruel and unusual" within the meaning of the Eighth Amendment requires ascertaining society's "evolving standards of decency," which, in turn, are determined by "evidence of contemporary values." *Graham*, 560 U.S. at 58, 62. Neither *Richardson*, which was decided nearly half a century ago, nor the 19th century history of Section 2 that the opinion recounted appear obviously relevant to the "evolving standards of decency" of today that the Eighth Amendment embodies. *Id.* at 58. We therefore see no way in which Section 2, as interpreted by *Richardson*, precludes an Eighth Amendment challenge to permanent criminal disenfranchisement today.

Our dissenting colleague contends that *Richardson* forecloses nearly all constitutional challenges to felon disenfranchisement. The argument goes: Because the Eighth Amendment's protection from cruel and unusual punishment is incorporated against the states through the Due Process Clause in Section One of the Fourteenth Amendment, and because *Richardson* held that California's permanent felon disenfranchisement did not violate Section One's Equal Protection Clause (a different clause than the Due Process Clause in Section One), Mississippi's law cannot violate the Eighth Amendment through Section One's Due Process Clause. One need not do more than restate the dissent's argument to demonstrate its lack of merit. As an initial matter, *Richardson* decided an Equal Protection challenge to permanent felon disenfranchisement, not a challenge based on a substantive right incorporated through the Due Process Clause. *Richardson*'s reading of how the Equal Protection Clause in Section One is limited by the representation reduction mechanism in Section Two says nothing about narrowing the scope of substantive rights incorporated through the Due Process Clause. The Supreme Court has made clear that the substantive rights contained in the Bill of Rights—including those of the Eighth Amendment—are not diluted or somehow lesser in content by virtue of their

No. 19-60662
c/w No. 19-60678

being incorporated through the Fourteenth Amendment. To the contrary, "incorporated Bill of Rights protections 'are all to be enforced against the States under the Fourteenth Amendment according to the same standards that protect those personal rights against federal encroachment.'" *McDonald v. City of Chicago*, 561 U.S. 742, 765 (2010) (quoting *Malloy v. Hogan*, 378 U.S. 1, 10 (1964)); *see also Timbs v. Indiana*, 139 S. Ct. 682, 687 (2019) ("Thus, if a Bill of Rights protection is incorporated, there is no daylight between the federal and state conduct it prohibits or requires."); *Kennedy v. Louisiana*, 554 U.S. 407, 419 (2008) (applying the Eighth Amendment through the Fourteenth by looking to the "norms that currently prevail," not "the standards that prevailed when the Eighth Amendment was adopted in 1791"). The dissent's novel theory of constitutional law is unsupportable.

The dissent's citations to generic canons of statutory interpretation are also meritless. The dissent argues that we allow the Eighth Amendment's "general" prohibition on cruel and unusual punishment to override Section Two's "specific" authorization of felon disenfranchisement as punishment. As an initial matter, we do not adopt the dissent's characterization of the Eighth Amendment as a "general" provision that must yield to the implicit authorization of felon disenfranchisement in Section 2 of the Fourteenth Amendment. Were that true, then no constitutional challenge to a state's felon disenfranchisement law would be possible, a result that is plainly incompatible with the Supreme Court's decision in *Hunter*. The dissent acknowledges that constitutional grants of power to legislate in a certain area "are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Post* at 57 (quoting *Williams v. Rhodes*, 393 U.S. 23, 29 (1968)). Our reading employs *this* canon of constitutional interpretation. It is the interpretive method that the Supreme Court has expressly instructed the lower courts to follow. And it is the one the Court has applied to an analogous question of whether felon

disenfranchisement may violate a substantive constitutional right. The answer to that question is clear: a state's felon disenfranchisement law may violate the Constitution, Section Two notwithstanding. *See Hunter*, 471 U.S. at 233.

We consider, then, whether Mississippi's permanent disenfranchisement scheme is supportable today under the Eighth Amendment.

### 2.    Permanent Disenfranchisement Under Section 241 is Punishment

As is self-evident from its text, the Eighth Amendment's Cruel and Unusual Punishment Clause applies only to punishments. The threshold Eighth Amendment issue therefore is whether Section 241 constitutes a punishment or, instead, a non-punitive regulation of the electoral franchise.

Our court has adopted "an intents-effects test" to help determine whether a statute constitutes punishment under various constitutional provisions, including the Eighth Amendment. *Does 1-7 v. Abbott*, 945 F.3d 307, 314 (5th Cir. 2019). Under this test, "[i]f the intention of the legislature was to impose punishment, that ends the inquiry[.]" *Id.* (quoting *Smith v. Doe*, 538 U.S. 84, 92 (2003)). In reviewing the legal context in which the Mississippi Constitutional Convention of 1890 enacted Section 241, we find strong evidence that the body's intent was to establish a punitive law, punishing and disenfranchising the targeted convicts without any legitimate penological goals.

As one of the "fundamental conditions" of Mississippi's reentry to the Union following the Civil War, Congress forbade "the constitution of Mississippi" from ever being "amended or changed [so] as to deprive any citizen or class of citizens of the United States of the right to vote . . . *except as a punishment* for such crimes as are now felonies at common law, whereof

No. 19-60662
c/w No. 19-60678

they shall have been duly convicted." Act of February 23, 1870, ch. 19, 16 STAT. 67 ("Readmission Act") (emphasis added). This condition on readmission, also imposed on other formerly Confederate states, was meant to address the nefarious tactics to restrict black suffrage already emerging in the Southern states despite the Fifteenth Amendment's recent passage. *See Oregon v. Mitchell*, 400 U.S. 112, 167 n.18 (1970). Under the plain language of the Readmission Act, Mississippi may only alter its constitution to authorize disenfranchisement if it does so *as a punishment* for a common law felony offense. This fundamental condition on Mississippi's power to enact a disenfranchisement scheme cannot be ignored: "the manner of [Section 241's] codification . . . [is] probative of the legislature's intent." *Smith*, 538 U.S. at 94. Therefore, Section 241 of Mississippi's 1890 Constitution—a post-Readmission Act felon disenfranchisement provision—must be construed as a punitive measure for felony convictions in order for the provision to comply with binding federal law. *See Jones v. Governor of Fla.*, 950 F.3d 795, 819 (11th Cir. 2020) (concluding that "[d]isenfranchisement is punishment," based in part on the fact that "the Readmission Act of Florida authorized felon disenfranchisement *only* as punishment.") (emphasis in original).[5]

---

[5] The dissent points out that the Eleventh Circuit reached a contrary conclusion in a different case, one involving whether an amendment to Alabama's voter disenfranchisement law was retroactive punishment that violated the Ex Post Facto clause. *Post* at 62 (discussing *Thompson v. Alabama*, 65 F.4th 1288, 1300 (11th Cir. 2023). True, the Eleventh Circuit did conclude that Alabama's new law—ratified by the state's voters in 1996—did not constitute punishment. *Id.* at 1303–1308. But, contrary to the dissent's claim, the Eleventh Circuit did not reach this conclusion despite the terms of the Readmission Act. The court never once mentioned the Readmission Act, let alone analyzed whether Alabama's modern law was punitive in light of the limitations the Readmission Act placed on the state's ability to disenfranchise its citizens. This case provides no support for the dissent's decision to ignore the plain terms of Mississippi's Readmission Act.

No. 19-60662
c/w No. 19-60678

Though there is historical evidence that some members of the 1890 Mississippi Constitutional Convention viewed the Mississippi Readmission Act generally as an unconstitutional intrusion into Mississippi's power to regulate elections,[6] there is no evidence that the Convention viewed the Act's limitation of disenfranchisement to cases of criminal punishment as invalid. More importantly, to conclude that Section 241 was not intended to impose punishment would require us to also conclude that Mississippi has been, and continues to be, in violation of the Readmission Act. Such a dramatic holding is not only unwarranted given the complete lack of evidence that Section 241 was intended to contravene the Readmission Act, but it would also expose Mississippi to broad liability for this violation. *See Williams ex rel. J.E. v. Reeves*, 954 F.3d 729, 739 (5th Cir. 2020) (allowing a claim that Mississippi violated the education provisions of the Readmission Act to proceed). Faced with the choice between reading Section 241 to comply with applicable federal law or reading it to violate the Readmission Act, we should "choose the interpretation . . . that has a chance of avoiding federal

---

Indeed, as the *Thompson* court itself noted, "disenfranchisement can be penal or nonpenal." *Id.* at 1303. "Accordingly, courts must determine the legislative intent behind the felon disenfranchisement statute or constitutional provision under consideration before holding that it is penal or nonpenal for constitutional purposes." *Id.* And here in this case, we have strong evidence of intent that the Eleventh Circuit never considered—the plain text of Mississippi's Readmission Act which prohibits disenfranchisement "except as a punishment for such crimes as are now felonies at common law." It is no wonder the cases reach different conclusions.

[6] The Convention's Judiciary Committee produced a report implying that the "fundamental conditions" of readmission that the Act purported to impose on the State exceeded Congress's constitutional powers. Proceedings of the Constitutional Convention at 83-87; *see also* William Alexander Mabry, *Disenfranchisement of the Negro in Mississippi* Vol 4. No. 3 Journal of Southern History 318, 325 (1938). Notably, this report concluded that franchise regulations like poll taxes and residency requirements were permitted under the Readmission Act. It was silent on the Act's limitation of felon disenfranchisement to punishment.

preemption." *Planned Parenthood of Houston and Se. Tex. v. Sanchez*, 403 F.3d 324, 342 (5th Cir. 2005).[7]

Neither the Secretary nor the dissent seriously engage with Plaintiffs' argument that the Readmission Act determines Section 241's purpose. The Secretary asserts that Plaintiffs' reliance on the Readmission Act to determine the Convention's intent is "self-defeating" and "illogical" because the Act permits disenfranchisement as punishment, and therefore ultimately undermines Plaintiffs' Eighth Amendment claim—an argument the dissent echoes. This argument attacks the wrong part of the analysis, failing to address the threshold question: whether Section 241's disenfranchisement inflicts a punishment in the first place. As to that question, the Readmission Act's authorization of disenfranchisement as punishment that the Secretary relies on supports Plaintiffs' position that the law is punishment. The Secretary and dissent also argue that the plain text of Section 241's criminal disenfranchisement provisions evinces no intention to punish and appears alongside nonpunitive regulations like age, competency, and residency requirements. We are unconvinced, however, that the disenfranchisement provisions' mere placement alongside regulatory franchise provisions is strong evidence that the former were not intended as punishment. "The location and labels of a statutory provision do not by themselves transform a [criminal] remedy into a [civil] one." *Smith*, 538 U.S. at 94 (2003); *see also Babbitt v. Sweet Home Chapter of Communities for a Great Oregon*, 515 U.S. 687, 702 (1995) (legislators can intend one provision of a law

---

[7] The dissent wishes to ignore the Readmission Act, declaring that the question whether Mississippi would violate the Act by passing non-punitive disenfranchisement regulations "is not before us." *Post* at 62. With respect, we fail to see how the dissent's conclusion—that Mississippi's disenfranchisement scheme is *not* punitive—would not immediately raise the question (and likely answer it) of whether the state had violated the terms of its readmission.

to have "a character of its own not to be submerged by its association" with neighboring provisions). Finally, the Secretary argues in a footnote that reading the Readmission Act to impose limits on Mississippi's power to disenfranchise—to read the Act to mean what it says—would violate the principle of "equal sovereignty," citing to *Shelby County v. Holder*, 570 U.S. 529 (2013). *Shelby County*, though, held no such thing. It expressly recognized that Congress "may draft" a law imposing burdens and limitations on some states and not others, and held merely that the method by which the Voting Rights Act did so was no longer justified given political and social changes since its formulation. 570 U.S. at 557.

We think that Section 241 must be read in light of the explicit requirements of the Readmission Act that Mississippi may only disenfranchise persons as punishment for conviction of a common law felony. Considered in this light, there is clear proof that Section 241 was intended as punishment—indeed, there can be no other permissible intention under the Readmission Act.

### 3.    Section 241 Violates Society's Evolving Standards of Decency

Having determined that Section 241 inflicts punishment, our next task is to determine whether its permanent denial of the franchise for conviction of an enumerated crime is "cruel and unusual" punishment under the Eighth Amendment as applied to Plaintiffs and their class. That is, we must decide whether this practice is in accord with "the evolving standards of decency that mark the progress of a maturing society." *Graham*, 560 U.S. at 58. In undertaking this inquiry, we first consider whether "there is a national consensus" against the challenged punishment. *Id.* at 61. The Supreme Court has instructed that this determination "should be informed by objective factors to the maximum possible extent." *Atkins v. Virginia*, 536 U.S. 304, 312 (2002) (internal quotation marks omitted). The "clearest and

most reliable objective evidence of contemporary values is the legislation enacted by the country's legislatures." *Id.* (internal quotation marks omitted); *see also Graham*, 560 U.S. at 61 ("The Court first considers objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the . . . practice at issue.") (internal quotation marks omitted). These benchmarks, however, are not completely dispositive of the matter. "[T]he Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of [Mississippi's voter disenfranchisement scheme] under the Eighth Amendment." *Coker v. Georgia*, 433 U.S. 584, 597 (1977); *see also Graham*, 560 U.S. at 61 (same).[8]

---

[8] In *Graham v. Florida*, the Supreme Court explained that the two-step analysis outlined above applies when a "case implicates a particular type of [punishment] as it applies to an entire class of offenders who have committed a range of crimes." 560 U.S. at 61. The Court uses this "categorical approach" in order to craft "categorical rules to define Eighth Amendment standards." *Id.* at 60, 62. By contrast, in cases where the Court considers "a gross proportionality challenge to a particular defendant's sentence," its analysis "begin[s] by comparing the gravity of the offense and the severity of the sentence." *Id.* at 60. In this case, it is not a particular defendant's sentence but rather a punishment "itself [that] is in question." *Id.* at 61. In other words, this case involves a "particular type of [punishment]"—permanent disenfranchisement—"as it applies to an entire class of offenders who have committed a range of crimes"—felons convicted of Section 241 disenfranchising offenses who have completed all terms of their court-imposed sentences. *Id.* Accordingly, and in light of the fact that no party suggests otherwise, we follow the Court's categorical approach to assessing this claim. *Id.*

The dissent argues that the categorical approach is inapplicable because the Supreme Court has so far only applied that analysis to sentences of death and of life without parole. That is true, but all it proves is that this case presents a res nova question. Having concluded that Section 241 exacts a punishment, we must ascertain whether that punishment exceeds the limits of the Eighth Amendment. As discussed above, the Supreme Court has instructed that, when examining the constitutionality of a particular practice of punishment applied to a range of offenses, rather than a specific defendant's sentence, courts should employ the categorical approach. *Graham*, 560 U.S. at 60–61. Such is the inquiry here, and so we follow the Supreme Court's instruction. The dissent offers

No. 19-60662
c/w No. 19-60678

### i.  National Consensus Against Permanent Disenfranchisement as a Punishment for Offenders Who Have Completed Their Sentences

To assess whether there is a "national consensus" against the challenged punishment, we consider "objective indicia of society's standards" as embodied in legislation, including not only the aggregate number of jurisdictions rejecting the punishment but also any consistent legislative trends in that direction. *Graham*, 560 U.S. at 62.

Turning first to legislation, an exhaustive review of state laws shows that the overwhelming majority of states oppose the punishment of permanently disenfranchising felons who have completed all terms of their sentences. Currently, thirty-five states and the District of Columbia do not permanently disenfranchise felons. *See* Appendix *infra*. And four other states only permit permanent disenfranchisement for corrupt practices in elections or governance. *Id.* For example, Maryland permanently disenfranchises felons convicted for buying or selling votes, while Missouri does so only as a result of a conviction for an offense "connected with right of suffrage." Md. Code, Elec. Law § 3-102(b); Mo. Rev. Stat. § 115.133.2. Mississippi is one of only eleven states that still permanently disenfranchises felons for offenses other than those pertaining to elections. Put another way, thirty-nine states plus the District of Columbia do not impose lifetime disenfranchisement as a punishment for offenses unrelated to protecting the honest administration of elections.

Significantly, the Supreme Court has found a national consensus against a punishment when far fewer states than here opposed it. For

---

no alternative other than to forgo the Eighth Amendment analysis completely. That we cannot do. "The Judiciary has the duty of implementing the constitutional safeguards that protect individual rights." *Trop v. Dulles*, 356 U.S. 86, 103 (1958).

No. 19-60662
c/w No. 19-60678

example, in *Atkins v. Virginia*, the Court determined that a "national consensus ha[d] developed against" executing the "mentally retarded"[9] when thirty states had legislatively proscribed the practice. 536 U.S. at 321, 326 (holding that executing members of this class of offenders is cruel and unusual). And the same number of states, thirty, had opposed the death penalty for juvenile offenders—either by "express provision [in legislation] or judicial interpretation"—when the Court held that practice to be cruel and unusual. *See Roper v. Virginia*, 543 U.S. 551, 564 (2005). Indeed, that only eleven states authorize the punishment challenged here closely resembles the statistics considered in *Enmund v. Florida*, in which the Court emphasized that the fact that only eight jurisdictions authorized the death penalty for participation in a robbery during which an accomplice commits murder "weigh[ed] on the side of rejecting capital punishment" for that offense. 458 U.S. 782, 793 (1982); *see also Kennedy v. Louisiana*, 554 U.S. 407, 426 *as modified* (Oct. 1, 2008) (holding that capital punishment for the crime of child rape violates the Eighth Amendment and observing that, "[t]hough our review of national consensus is not confined to tallying the number of States with applicable death penalty legislation, it is of significance that, in 45 jurisdictions, petitioner could not be executed for child rape of any kind").

A national consensus that a punishment is cruel and unusual may be further evidenced by a clear and consistent trend in state legislatures to abandon the punishment, particularly in response to a court decision upholding the punishment's validity. *Roper*, 543 U.S. 566–67 (explaining that, besides the sheer number of states rejecting a practice, the "consistency of the direction of change" is a significant factor in determining whether

---

[9] The contemporary preferred terminology for such persons is people with intellectual or cognitive disabilities. *See Hall v. Florida*, 572 U.S. 701, 704 (2014).

No. 19-60662
c/w No. 19-60678

there is a national consensus against a practice). In *Penry v. Lynaugh*, for example, the Court held that the execution of the "mentally retarded" did not violate the Eighth Amendment. 492 U.S. 302, 334 (1989). The Court reasoned that the laws of sixteen states and the federal government[10] precluding the execution of this vulnerable class of persons were insufficient to show a national consensus against this practice. *Id.* at 334. Thirteen years after *Penry*, the Court revisited that decision in *Atkins*. Again, the Court considered whether a national consensus existed against capital punishment for the "mentally retarded," this time focusing primarily on the development of any consistent trends since *Penry* opposing this practice. What "was significant," the Court explained, was "not so much the [total] number of these States" that had acted since *Penry* to ban executing members of this class of offenders—sixteen had done so—"but the consistency of the direction of change." *Atkins*, 536 U.S. at 315. As the Court succinctly put it, "[m]uch ha[d] changed since" *Penry*, and, indeed, "a national consensus ha[d] developed" against the challenged practice in response to the earlier decision. *Id.* at 314, 316.

Similarly, in *Roper*, which struck down the juvenile death penalty, the Court stressed the consistency of the direction of change in rejecting that practice. 543 U.S. at 568. Though only five states had abandoned juvenile executions in the fifteen years since the Supreme Court upheld the punishment in *Stanford v. Kentucky*, 492 U.S. 361, 370–71 (1989), the *Roper* Court followed *Atkins*'s admonition that what matters under the Eighth Amendment is "not so much" the absolute number of states that have abandoned a particular practice or the pace of that abandonment, but instead

---

[10] Only two states and the federal government specifically prohibited executing the cognitively disabled, while fourteen other states prohibited the death penalty categorically. *Penry*, 492 U.S. at 334.

the "consistency of the direction of change." *Id.* at 566. Thus, the shift in state laws between *Stanford* and *Roper*, though smaller in number, was nonetheless "significant" because, as in *Atkins*, "the same consistency of direction of change ha[d] been demonstrated." *Id.* at 565, 566.

With regard to lifetime felon disenfranchisement, at the time the Supreme Court decided *Richardson* in 1974, twenty-seven states permitted the practice as applied to felons whose offenses were unrelated to elections or good governance and who had completed all terms of their sentences. *See* Appendix. Currently, only eleven do. Since *Richardson*, sixteen states have stopped the practice of imposing lifetime disenfranchisement on felons who have served their sentences for offenses unrelated to elections or governance. *See* Appendix. That is the exact number of states that changed their laws to reject the execution of the "mentally retarded" between *Penry* and *Atkins*. And it is more than threefold the total number of states that abolished the juvenile death penalty in the timespan between *Stanford* and *Roper*. The evidence clearly demonstrates "consistency [in] the direction of change," and a repudiation of permanent felon disenfranchisement. *Roper*, 543 U.S. at 566 (quoting *Atkins*, 536 U.S. at 315); *see also* Amicus Brief of the District of Columbia, et al., *Community Success Initiative v. Moore*, No. 331PA21 at 4–9 (N.C. Aug. 17, 2022) (discussing the "clear and growing consensus among states" against permanent disenfranchisement). That a trend in abandoning a punishment has proven so durable and long-lasting demonstrates that society has truly turned away from that punishment. In this way, the steady rejection of permanent felon disenfranchisement over nearly half a century is as much, or even more, consistent than the change in the punishment laws considered in *Atkins* and *Roper*.

In sum, the objective barometers of society's standards—namely, the rejection of permanent felon disenfranchisement for offenses unrelated to elections and good governance by a clear majority of states and the

No. 19-60662
c/w No. 19-60678

consistency in the trend toward abolition of the practice—provide sufficient evidence of a national consensus against punishing felons by permanently barring them from the ballot box even when they have completed all terms of their sentences.

The Secretary counters that there can be no national consensus against permanent felon disenfranchisement because many states disenfranchise felons for some period of time, such as during their period of incarceration or until completion of parole or probation. It is true that almost all states disqualify felons from voting at least while they are incarcerated or under supervision, Maine and Vermont being the exceptions. The dissent makes the same argument, asserting that there can be no national consensus when the states disenfranchise felons in such diverse ways. But this case does not concern the validity of temporary felon disenfranchisement laws, or the disenfranchisement of the incarcerated, or any other particular mode of disenfranchisement not contained in Section 241. In the present case, we are concerned solely with Mississippi's practice of punishing felons who have completed all terms of their sentences by *permanently* disenfranchising them for life. And objective evidence makes clear that a supermajority of states reject this practice.

The Secretary also emphasizes that Section 241 only permanently disenfranchises for the categories of felonies enumerated therein and that therefore individuals who commit felonies not included under Section 241 are not disqualified from voting. But, having already determined that the state permanently disenfranchises as punishment, *see supra* part III.D.2, the fact that the state chooses not to exact this punishment against all felons is immaterial to our current analysis of whether a national consensus against this punishment exists. We need not, as the Secretary apparently invites us to do, go felony-by-felony, asking whether there is a national consensus against permanent disenfranchisement as a punishment for each specific

No. 19-60662
c/w No. 19-60678

felony offense.[11] Rather, the objective indicia of society's standards demonstrate that a consensus exists against meting out this sanction as a punishment, and the Secretary's arguments to the contrary are unavailing. Based on the evidence before us, we conclude that our society has set its face against permanent disenfranchisement as a punishment.

## ii.    Independent Judicial Determination that Section 241 is Cruel and Unusual

We must next "determine, in the exercise of our own independent judgment, whether [permanent disenfranchisement under Section 241] is a disproportionate punishment for" those Mississippians who have completed their sentences but remain permanently disenfranchised. *Roper*, 543 U.S. at 564. This assessment requires us to consider "the severity of the punishment in question," "the culpability of the offenders at issue in light of their crimes and characteristics," and "whether the challenged . . . practice serves legitimate penological goals." *Graham*, 560 U.S. at 67.

Before undertaking this inquiry, we emphasize that the issue here is not, of course, whether the offenses listed in Section 241 warrant criminal sanction. Rather, the question is whether punishing an individual who has served the terms of his sentence by forever withholding from him the right to

---

[11] If we were to accept the invitation to investigate Mississippi's disenfranchisement scheme felony-by-felony, it would not stand the state in good stead. Section 241 lists a fraction of the hundreds of crimes on Mississippi's books. That means that Mississippi citizens who are convicted of non-Section 241 offenses are not disenfranchised for life. Consequently, the Mississippi felons who remain permanently disenfranchised after serving all of their sentences are subjected to an especially cruel and unusual punishment as compared to Mississippi felons not convicted of Section 241 crimes and felons in states that do not engage in permanent disenfranchisement. And the Secretary has presented no evidence that any penological or other goals are furthered or justified by permanently disenfranchising only the felons convicted of the crimes encompassed in Section 241's list.

No. 19-60662
c/w No. 19-60678

vote constitutes cruel and unusual punishment under the Supreme Court's precedents and our own reasoning. And to determine whether this punishment is proportional to Plaintiffs' offenses, it is first necessary to assess the importance of the right that Plaintiffs are denied. *See Atkins*, 563 U.S. at 311 ("It is a precept of justice that punishment for crime should be graduated and proportioned to the offense.") (cleaned up) (quoting *Weems v. United States*, 217 U.S. 349, 367 (1910)).

In a democracy, the right to vote is a "fundamental political right" because it is "preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886); *see also Burson v. Freeman*, 504 U.S. 191, 198 (1992) (plurality opinion) (observing that the right to vote is "a right at the heart of our democracy"). "No right is more precious in a free country" than the right to vote. *Reynolds v. Sims*, 377 U.S. 533, 560 (1964). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* "A citizen without a vote is to a large extent one without a voice in decisions which may profoundly affect him and his family." *Rosario v. Rockefeller*, 410 U.S. 752, 764 (1973) (Powell, J., dissenting).

The Supreme Court's soaring language on the right to vote makes clear two fundamental and interrelated points: (1) voting is the lifeblood of our democracy and (2) the deprivation of the right to vote saps citizens of their essential right to have a say in how and by whom they are governed. Permanent denial of the franchise, then, is an exceptionally severe penalty, constituting nothing short of the denial of the democratic core of American citizenship. It is an especially cruel penalty as applied to those whom the justice system has already deemed to have completed all terms of their sentences. These individuals, despite having satisfied their debt to society, are precluded from ever fully participating in civic life. Indeed, they are excluded from the most essential feature and expression of citizenship in a democracy—voting.

No. 19-60662
c/w No. 19-60678

Turning to the culpability of Plaintiffs' class, we observe that Section 241's punishment applies equally to all members of the class, regardless of their underlying crime or the class member's individual mental state during the commission of the crime. Section 241 disenfranchises murderers and timber thieves alike; it does not distinguish between mature adults and juveniles, accomplices, or the intellectually disabled—the latter three being classes of persons the Supreme Court has recognized as categorically less culpable. *Roper*, 543 U.S. at 570; *Enmund*, 458 U.S. at 800–801; *Atkins*, 536 U.S. at 317–18. It is clear, then, that Section 241 does not reflect society's measured response to a felon's moral guilt. Rather, as the provision's odious origins make clear, Section 241's infliction of disenfranchisement on only certain offenders has nothing to do with their heightened culpability.

Next, we consider whether the punishment of permanent disenfranchisement advances any legitimate penological goals. *Graham*, 560 U.S. at 68. A punishment that "lack[s] any legitimate penological justification is by its nature disproportionate to the offense." *Id.* at 71. The traditional justifications for punishment are incapacitation, rehabilitation, deterrence, and retribution. *Id.* at 71–74.

Taking these in turn, incapacitation cannot support Section 241's punishment because it does not incapacitate a convict from committing crimes; it only prevents him from voting. While felon disenfranchisement could potentially prevent recidivism if it were applied specifically to those convicted of voting-related offenses, Section 241, as discussed, applies to broad categories that are unrelated to elections crimes. And as to these categories of crimes, Section 241 does nothing to thwart a former felon from reoffending. Rather, the only conduct it incapacitates is voting. Further, there is evidence that disenfranchisement may actually *increase* recidivism. One comparative study found that "individuals who are released in states that permanently disenfranchise are roughly nineteen percent more likely to

be rearrested than those released in states that restore the franchise post-release." Guy Padraic Hamilton-Smith & Matt Vogel, *The Violence of Voicelessness: The Impact of Felony Disenfranchisement on Recidivism*, 22 Berkeley La Raza L.J. 407, 426 (2012).

Section 241 does not further the goal of rehabilitation. Lifetime disenfranchisement does not contribute to reforming an offender. Quite to the contrary, it hinders reintegration into society by denying voting, a cherished marker and right of citizenship. *See Reynolds*, 377 U.S. at 560. The Secretary has not argued otherwise, claiming that felon disenfranchisement's precise purpose is to exclude a former felon from participation in this aspect of our society. There is "no more certain way in which to make a man in whom, perhaps, rest the seeds of serious antisocial behavior more likely to pursue further a career of unlawful activity than to place on him the stigma of the derelict, uncertain of many of his basic rights." *Trop v. Dulles*, 356 U.S. 86, 111 (1958) (Brennan, J. concurring). This exclusion is not rehabilitative. If anything, it can only reinforce the stigma that the disenfranchised are "beyond redemption." Pamela S. Karlan, *Convictions and Doubts: Retribution, Representation, and the Debate over Felon Disenfranchisement*, 56 Stan. L. Rev. 1147, 1166 (2004); *see also* Alec C. Ewald, *"Civil Death": The Ideological Paradox of Criminal Disenfranchisement Law in the United States*, 2002 Wis. L. Rev. 1045, 1112–16 (2002) (discussing the republican case against disenfranchisement as anti-rehabilitative).

For its part, deterrence only works if an individual is aware that a particular punishment attends a particular offense. It is questionable—and we have been presented with no evidence to suggest otherwise—to what extent Mississippians, and specifically those who would consider committing a crime covered by Section 241, are aware they could permanently lose the right to vote by virtue of a conviction. Moreover, it is unclear—and again we have been presented with no evidence that makes it clear—what marginal

deterrent effect the prospect of losing the franchise has when a person committing a felony already faces the more immediate sanction of criminal confinement. Similarly, there is no reason to believe that the punishment of disenfranchisement will deter recidivism because the felon who has lost the franchise under Section 241 has lost it forever, regardless of his future conduct.

That leaves retribution. While this is a "legitimate reason to punish," *Graham*, 560 U.S. at 71, "the severity of the appropriate punishment necessarily depends on the culpability of the offender[.]" *Atkins*, 536 U.S. at 319. We have explained that the continuing—indeed, unending—punishment Section 241 inflicts is wholly unrelated to the moral culpability of the diverse class of felons it applies to. Moreover, because the sentences imposed on Plaintiffs are necessarily ones that are capable of being completed, the criminal justice system has implicitly determined that Plaintiffs who served their sentences are capable of being returned to a position within society. And the fact that Plaintiffs have actually completed all terms of their sentences means that they merit being restored to their basic rights as citizens. To permanently remove from them the most precious right of citizenship is thus disproportionate to their offenses and cannot stand as a permissible exercise of retribution. *See Roper*, 543 U.S. at 564; *Reynolds*, 377 U.S. at 561.

For those adjudicated to have committed a crime enumerated in Section 241 and whose judicially imposed sentence has been completed, the provision tacks on an exceptionally severe penalty—one that is unconstitutional as to all it ensnares. Our nation has a tradition of fixing punishment to meet the crime. After a sentence is complete, the individual is said to have paid his debt to society. While some disabilities may attach to a felony conviction that persist beyond the criminal sentence, in a democracy, to deny the right to vote is to render one without a say in the manifold ways

the government touches his life. That Mississippi denies this most precious right permanently, despite the felon's sentence having been served, is disproportionate and inconsistent with the consensus against permanent disenfranchisement among state legislatures. The punishment of permanent disenfranchisement also contravenes the Eighth Amendment's proportionality principle because it lacks a nexus with any legitimate penological justification. *See Miller*, 567 U.S. 460, 489 (2012); *Graham*, 560 U.S. at 71. Thus, insofar as it applies to those who have fulfilled all terms of their sentences, Section 241 is proscribed by the Eighth Amendment's advancing standards of decency under the Constitution.

## VII.   Conclusion

"No right is more precious in a free country" than the right to vote. *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964). "Other rights, even the most basic, are illusory if the right to vote is undermined." *Id.* This right is not only fundamental to the democratic ordering of our society, it is also expressive of the dignity of American citizenship—that each person is an equal participant in charting our nation's course. *Reynolds*, 377 U.S. at 533; *Bush v. Gore*, 531 U.S. 98, 104 (2000) ("[O]ne source of [the right to vote's] fundamental nature lies in the equal weight accorded to each vote and the equal dignity owed to each voter.").

Mississippi denies this precious right to a large class of its citizens, automatically, mechanically, and with no thought given to whether it is proportionate as punishment for an amorphous and partial list of crimes. In so excluding former offenders from a basic aspect of democratic life, often long after their sentences have been served, Mississippi inflicts a disproportionate punishment that has been rejected by a majority of the states and, in the independent judgment of this court informed by our precedents, is at odds with society's evolving standards of decency. Section

241 therefore exacts a cruel and unusual punishment on Plaintiffs. Accordingly, we REVERSE the district court's grant of summary judgment to the Secretary on Plaintiffs' Eighth Amendment claim and RENDER judgment for Plaintiffs on that claim. The case is REMANDED with instructions that the district court grant relief declaring Section 241 unconstitutional and enjoining the Secretary from enforcing Section 241 against the Plaintiffs and the members of the class they represent.

## APPENDIX

*States with permanent criminal disenfranchisement penalties*

| 1974 | 2000 | 2020 |
|------|------|------|
| Alabama | Alabama | Alabama |
| Alaska | Arizona | Arizona |
| Arizona | California | Delaware |
| Arkansas | Delaware | Florida |
| California | Florida | Iowa |
| Connecticut | Iowa | Kentucky |
| Florida* | Kentucky | Maryland* |
| Georgia | Maryland | Massachusetts* |
| Idaho | Massachusetts* | Mississippi |
| Iowa | Mississippi | Missouri* |
| Kentucky | Missouri | Nebraska |
| Louisiana | Nebraska | New Jersey* |
| Maryland* | New Hampshire | Tennessee |
| Massachusetts* | New Jersey* | Virginia |
| Mississippi | New Mexico | Wyoming |

No. 19-60662
c/w No. 19-60678

| | |
|---|---|
| Missouri | New York |
| Nebraska | Ohio* |
| Nevada | Tennessee |
| New Hampshire | Virginia |
| New Jersey* | Washington |
| New Mexico | Wyoming |
| New York | |
| North Dakota | |
| Oklahoma | |
| Rhode Island | |
| South Carolina | |
| Tennessee | |
| Texas | |
| Utah* | |
| Virginia | |
| Washington | |
| Wyoming | |

*Permanent disenfranchisement for election-related offenses only.*

*States with permanent disenfranchisement penalties (with citations)*

| 1974 | | 2000 | | 2020 | |
|---|---|---|---|---|---|
| **State** | **Citation** | **State** | **Citation** | **State** | **Citation** |
| Alabama | *Ala. Const. art. VIII, § 182; Ala. Code tit. 17 § 15 (1958)* | Alabama | *Ala. Const. art. VIII sec. 177 (see also Amendment 579 (1996)); Ala. Code.* | Alabama | *Ala. Const. art. VIII § 177; Ala. Code. § 15-22-36.1.* |

No. 19-60662
c/w No. 19-60678

| | | | 17-3-10 (2000) | | |
|---|---|---|---|---|---|
| Alaska | *Ak. Const. art. V § 2; Ak. Code § 15.05.030 (1960)* | Arizona | *Ariz. Const. art. 7 sec. 2; Ariz. Stat. 13-905, 13-909-12 (2000)* | Arizona | *Ariz. Rev. Stat. § 13-908(A); Ariz. Rev. Stat. 13-907(A)* |
| Arizona | *Ariz. Const. art. 7 § 2; Ariz. Rev. Stat. § 16-101(5)* | California | *Cal. Const. art. 2 sec. 4; Cal. Penal Code 4852.01, 4852.17, 4853 (2000)* | Delaware | *Del. Const. art. 5 sec. 2* |
| Arkansas | *Ark. Const. art. 3 § 6 (1947)* | Delaware | *Del. Const. art. 5 sec. 2, 7; 15 Del. Code sec. 1701, 5104 (2000)* | Florida | *Fla. Const. art. VI, § 4; Fla. Stat. § 944.292(1); Fla. Const. art. IV, § 8 (a), (c)* |
| California | *Cal. Const. art. 2 § 3 (1972); Elec. Code §§ 310, 321, 383, 389, 390; Ramirez v. Brown, 507 P.2d 1345, 1347 (Cal. 1973)* | Florida | *Fla. Stat. 97.041, 944.292, 944.293; Fla. Const. art. 6 sec. 4 (2000)* | Iowa | *Iowa Const. art. 2 sec. 5* |
| Connecti-cut | *Conn. Rev. Stat. 9-46 (1973)* | Iowa | *Iowa Const. art. 2 sec. 5; Iowa Code sec. 48A.6 (2000)* | Kentucky | *Ky. Const. sec. 145* |

No. 19-60662
c/w No. 19-60678

| Florida* | *Fla. Const. art. VI §. 4 (1973); Fla. Code 97.041(5)* | Kentucky | *Ky. Const. sec. 145; Ky. Stat. 116.025 (2000)* | Mary-land* | *Md. Elec. Code sec 3-102* |
|---|---|---|---|---|---|
| Georgia | *Ga. Const. art. II § 2-701 (1945)* | Maryland | *Md. Const. art. 1 sec. 4; Md. Code art. 33, sec. 3-102 (2000)* | Massa-chusetts* | *Ma. Const. art 3; Ma. Gen. L. 51 sec. 1* |
| Idaho | *Idaho Const. art. 6 § 3 (1947); Idaho Code 34-402 (1949)* | Massa-chusetts* | *Ma. Const. art 3; Ma. Gen. L. 51 sec. 1 (2000)* | Missis-sippi | *Miss. Const. art. XII § 241* |
| Iowa | *Iowa Const. art. 2 § 2* | Missis-sippi | *Miss. Const. sec. 241; Miss Code 23-5-35 (1972)* | Missouri* | *Mo. Rev. Stat. § 115.133.2* |
| Kentucky | *Ky. Const. art. 145 (1955)* | Missouri | *Mo. Stat. 115.113 (2000)* | Nebraska | *Neb. Rev. Stat. § 29-112; § 32-313* |
| Louisiana | *La. Const. art. 8 § 6 (1968)* | Nebraska | *Neb. Stat. 32-313 (2000); Ways v. Shively, 264 Neb. 250 (2002)* | New Jer-sey* | *N.J. Stat. 19:4-1* |
| Mary-land* | *Md. Const. art. I § 2 (1972); Md. Code. Art. 33 ¶ 3-4 (1974)* | New Hamp-shire | *N.H. Const. Pt. 1 art. 11 (2000)* | Tennes-see | *Tenn. Code Ann. § 40-29-204* |
| Massa-chusetts* | *Mass. Gen. Laws chp. 51 § 1 (1972)* | New Jer-sey* | *N.J. Stat. 19:4-1 (2000)* | Virginia | *Va. Const. art. II, § 1; art. V, § 12.* |

No. 19-60662
c/w No. 19-60678

| Mississippi | *Miss. Const. § 241; Miss Code 23-5-35 (1972)* | New Mexico | *N.M. Stat. sec. 31-13-1 (2000)* | Wyoming | *W.S. Ann. 6-10-106; W.S. 7-13-105(a), (b); Wyo. Const. art. 4, § 5.* |
|---|---|---|---|---|---|
| Missouri | *Mo. Rev. Stat. 111.021 (1969)* | New York | *N.Y. Const. art. 2 sec. 3; N.Y. Code 5-106 (2000)* | | |
| Nebraska | *Neb. Const. art. VI § 2; Neb. Rev. Stat. 29-112, 29-113 (1974)* | Ohio* | *Ohio Stat. 2961.01, 3599.39 (2000)* | | |
| Nevada | *Nev. Const. art. 2 § 1; Nev. Rev. Stat. 213.090, 213.155* | Tennessee | *Tenn. Code 40-29-105 (2000)* | | |
| New Hampshire | *N.H. Const. art. 11 (1970); N.H. Rev. Stat. 607-A-2 (1974)* | Virginia | *Va. Const. art. 2 sec. 1; Va. Code 53.1-231.2 (2000)* | | |
| New Jersey* | *N.J. Rev. Stat. 19:4-1 (1971)* | Washington | *Wash. Const. art. 6 sec. 3; RCW 9.94A.637 (2000); Madison v. State, 161 Wash. 2d 85 (2007).* | | |
| New Mexico | *N.M. Const. art. VII § 1 (1973)* | Wyoming | *Wyo. 6-10-106; 7-13-105 (2000)* | | |

No. 19-60662
c/w No. 19-60678

| New York | *N.Y. Elec. Law 152 (1964)* |
|---|---|
| North Da-kota | *N.D. Const. art. V § 127 (1960)* |
| Oklahoma | *Okla. Const. art. III § 1 (1974)* |
| Rhode Is-land | *R.I. Const. art. Am. XXXVIII (1973)* |
| South Carolina | *S.C. Const. art. 2 sec. 7; S.C. Code 23-62 (1962, 1975 Supp)* |
| Tennes-see | *Tenn. Const. art. 4 sec. 2 ; Tenn. Code 2-205 (1971);* |
| Texas | *Tex. Const. art. 16 sec. 2; Tex. Rev. Stat. art. 5.01 (1967)* |
| Utah* | *Utah Const. art. IV sec. 8 (1971)* |
| Virginia | *Va. Const. art. II sec. 2; Va. Code 24.1-42 (1973)* |
| Washing-ton | *Wash. Const. art. 6 sec. 3 (1974);* |

No. 19-60662
c/w No. 19-60678

| Wyoming | *Wyo. Const. art. 6 sec. 6 (1957); Wyo. Stat. 6-4 (1957); Wyo. Stat. 7-311 (1957)* |
|---------|---|

*\* Permanent disenfranchisement for election-related offenses only.*

No. 19-60662
c/w No. 19-60678

Edith H. Jones, *Circuit Judge*, dissenting:

The panel decision holds that Section 241 of the Mississippi Constitution, recently upheld in this court against another challenge,[1] now fails the test of Eighth Amendment scrutiny, incorporated by the Fourteenth Amendment Due Process Clause. Because the majority never fully quotes the relevant provision, I begin with text, which states that a mentally competent inhabitant of Mississippi:

> who is a citizen of the United States of America, eighteen (18) years old and upward, who has been a resident of this state for one (1) year, and for one (1) year in the county in which he offers to vote, and for six (6) months in the election precinct or in the incorporated city or town in which he offers to vote, and who is duly registered as provided in this article, and who has never been convicted of murder, rape, bribery, theft, arson, obtaining money or goods under false pretense, perjury, forgery, embezzlement or bigamy, is declared to be a qualified elector.

Miss. Const. Art. 12, § 241.

Laws like this one have faced many unsuccessful constitutional challenges in the past. When the Supreme Court ruled that the Equal Protection Clause does not bar states from permanently disenfranchising felons, it dispensed some advice to the losing parties:

> We would by no means discount these arguments if addressed to the legislative forum which may properly weigh and balance them. . . . But it is not for us to choose one set of values over the other. If respondents are correct, and the view which they advocate is indeed the more enlightened and sensible one, presumably the people . . . will ultimately come around to that

---

[1] *Harness v. Watson*, 47 F.4th 296, 311 (5th Cir. 2022) (en banc), *pet. for cert. filed* (Oct. 28, 2022) (No. 22-412).

No. 19-60662
c/w No. 19-60678

view. And if they do not do so, their failure is some evidence,
at least, of the fact that there are two sides to the argument.

*Richardson v. Ramirez*, 418 U.S. 24, 55, 94 S. Ct. 2655, 2671 (1974). In other
words: go and convince the state legislatures. Do the hard work of persuading
your fellow citizens that the law should change.

Today, the court turns that advice on its head. No need to change the
law through a laborious political process. The court will do it for you, so long
as you rely on the *Due Process Clause*, rather than the *Equal Protection Clause*.
With respect, this is not a road that the Constitution—or precedent—allows
us to travel. I dissent.[2]

## I.

Section One of the Fourteenth Amendment guarantees "due pro-
cess" and "equal protection of the laws." U.S. CONST. amend. XIV § 1.
After a long process of exegesis, it is settled that the Due Process Clause in-
corporates much of the Bill of Rights, and state governments must respect
protections like the Eighth Amendment's prohibition of cruel and unusual
punishment. *See McDonald v. City of Chicago*, 561 U.S. 742, 763, 130 S. Ct.
3020, 3034 (2010).

Section Two of the Fourteenth Amendment is less familiar but more
specific. It reduces the number of representatives in Congress to which a
state is entitled if that state disenfranchises any of its male, non-Indian citi-
zens over the age of 21. But there is a single exception: states may not be
penalized for disenfranchising a citizen "for participation in rebellion, *or other
crime*." U.S. CONST. amend. XIV § 2 (emphasis added). The carve-out

---

[2] To be precise, I do not quarrel with the holding that Plaintiffs have standing to
challenge Section 241 of the state constitution but not Section 253. And like the majority,
I need not separately address the plaintiffs' First Amendment claim, which is inextricably
bound with my conclusions regarding the Eighth Amendment.

No. 19-60662
c/w No. 19-60678

reflects a long tradition in this country, and before that, in British law, and before that, in the Western world.[3] This tradition can be summed up in Lockean terms: if a person breaks the laws, he has forfeited the right to participate in making them. *See Green v. Bd. of Elections of N.Y.C.*, 380 F.2d 445, 451 (2d Cir. 1967) (Friendly, J.).

Despite Section Two's explicit allowance of felon disenfranchisement, plaintiffs alleged in *Richardson* that California's felon disenfranchisement law violated Section One's Equal Protection Clause. The Supreme Court rejected the argument as it held that the specific language in Section Two casts light on the generalities of Section One. 418 U.S. at 43, 94 S. Ct. at 2665 (finding persuasive the petitioner's argument that "those who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in [Section One] of that Amendment that which was expressly exempted from the lesser sanction of reduced representation imposed by [Section Two] of the Amendment.").

The plaintiffs in today's case differ from those in *Richardson* in only one way: they allege that Mississippi's felon disenfranchisement law violates Section One's Due Process Clause. Their reasoning, and the majority's holding, relies on three propositions. One is the undisputed rule that the Due Process Clause incorporates the Eighth Amendment's prohibition against cruel and unusual punishments. But the other two propositions are false. Contrary to the majority, *Richardson*'s ruling extends beyond the Equal Protection context, and felon disenfranchisement is not a cruel and unusual punishment. I address each faulty proposition in turn.

---

[3] For a brief summary of that tradition, see George Brooks, *Felon Disenfranchisement: Law, History, Policy, and Politics*, 32 FORDHAM URB. L.J. 851, 852-61 (2005).

No. 19-60662
c/w No. 19-60678

## II.

To begin with, *Richardson v. Ramirez* controls this case. Its holding did not rest on which part of Section One was invoked by the plaintiffs, but "on the demonstrably sound proposition that [Section One], in dealing with voting rights as it does, could not have been meant to bar outright a form of disenfranchisement which was expressly exempted from the less drastic sanction of reduced representation which [Section Two] imposed for other forms of disenfranchisement." *Id.* at 55, 2671. This is far from the only language in the opinion that has applicability beyond the Equal Protection Clause. *See Richardson*, 418 U.S. at 43, 94 S. Ct. at 2665 ("[T]hose who framed and adopted the Fourteenth Amendment could not have intended to prohibit outright in [Section One] . . . that which was expressly exempted from . . . [Section Two] of the Amendment."); *id.* at 54, 2670 (relying on the "settled historical and judicial understanding of *the Fourteenth Amendment's effect* on state laws disenfranchising convicted felons") (emphasis added); *id.* at 55, 2671 (urging would-be reformers to petition the state legislatures rather than the courts); *id.* at 48, 2668 (focusing "on the understanding of those who framed and ratified the Fourteenth Amendment" as a whole). On this logic, it is irrelevant what clause of Section One is cited by plaintiffs. None of its provisions can be understood to bar what Section Two plainly allows.

It changes nothing that plaintiffs rely on Eighth Amendment precedent. That precedent is made applicable to Mississippi via the Due Process Clause. *Robinson v. California*, 370 U.S. 660, 667, 82 S. Ct. 1417, 1421 (1962). Therefore, the Eighth Amendment right asserted by plaintiffs cannot exceed the scope of the Due Process Clause.

Even if the Eighth Amendment right were considered on its own terms, *Richardson*'s reading of Section Two must still guide our interpretation of its scope. As interpreters of the Constitution, judges must seek "a fair construction of the whole instrument." *McCulloch v. Maryland*, 17 U.S. (4

Wheat.) 316, 406 (1819). All of its provisions "should be interpreted in a way that renders them compatible, not contradictory." ANTONIN SCALIA & BRYAN A. GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS 180 (2012) ("READING LAW"). Yet the majority's interpretation renders the Section Two proviso meaningless. It is useless for the Fourteenth Amendment to authorize felon disenfranchisement if the practice is made illegal by the Eighth. The canon against surplusage warns us against such unnatural readings. *Id.* at 174.

Thus, the Cruel and Unusual Punishments Clause should not be understood to prohibit what "the explicit language of the Constitution affirmatively acknowledges" elsewhere as legitimate. *Furman v. Georgia*, 408 U.S. 238, 380, 92 S. Ct. 2726, 2799 (1972) (Burger, C.J., dissenting); *see also Gregg v. Georgia*, 428 U.S. 153, 177, 96 S. Ct. 2909, 2927 (1976) (approving capital punishment under certain circumstances). *Cf. Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45, 51, 79 S. Ct. 985, 990 (1959) (stating that a "criminal record" is one of the "factors which a State may take into consideration in determining the qualifications of voters."); *Romer v. Evans*, 517 U.S. 620, 634, 116 S. Ct. 1620, 1628 (1996) ("that a convicted felon may be denied the right to vote . . . is" an "unexceptionable" proposition). Following this rule, this court and others have concluded without reservation that "a state has the power to disenfranchise persons convicted of a felony," even permanently. *Shepherd v. Trevino*, 575 F.2d 1110, 1112 (5th Cir. 1978).[4]

---

[4] *See also Jones v. Governor of Fla.*, 950 F.3d 795, 801 (11th Cir. 2020) ("Regardless of the political trend toward re-enfranchisement, there is nothing unconstitutional about disenfranchising felons—even all felons, even for life." (citing *Richardson*, 418 U.S. at 56)); *Hayden v. Pataki*, 449 F.3d 305, 316 (2d Cir. 2006) ("The Supreme Court has ruled that, as a result of th[e] language of [Section 2], felon disenfranchisement provisions are presumptively constitutional.").

No. 19-60662
c/w No. 19-60678

It is true that "provisions that grant Congress or the States specific power to legislate in certain areas . . . are always subject to the limitation that they may not be exercised in a way that violates other specific provisions of the Constitution." *Williams v. Rhodes*, 393 U.S. 23, 29, 8 S. Ct. 5, 9 (1968). For example, a state may not disenfranchise felons with racially discriminatory intent. *Hunter v. Underwood*, 471 U.S. 222, 233, 105 S. Ct. 1916, 1922 (1985).[5] Likewise, as the majority recognizes, the Thirteenth Amendment bars involuntary servitude "except as a punishment for crime." U.S. CONST. amend. XIII. Nevertheless, certain involuntary work requirements imposed on convicted criminals may violate the Cruel and Unusual Punishments Clause. *Williams v. Henagan*, 595 F.3d 610, 622 n. 18 (5th Cir. 2010).

But that principle places a "limitation" on the "exercise" of a legitimate power; it cannot void the power entirely. *Williams*, 393 U.S. at 29, 89 S. Ct. at 9. Today's ruling goes far beyond *Hunter*'s holding that felon disenfranchisement must be exercised in accord with the Constitution. The majority concludes that the "punishment of permanent disenfranchisement" is entirely unconstitutional. This unjustifiably creates an internal conflict in the Constitution by holding that the Eighth Amendment preempts Section Two of the Fourteenth Amendment.

Moreover, even if this court found a conflict between the Eighth Amendment and Section Two of the Fourteenth—which, to restate emphatically, it should not have done—the established canons of interpretation dictate that Section Two should be given effect. It is both more specific and later in time than the Eighth Amendment. If "there is a conflict between a general

---

[5] To clarify a point for confused readers: this is not an issue in today's case. Sitting *en banc*, this court has already held that the current version of Section 241 was not enacted with discriminatory intent—a finding the majority neglects to mention in its long and irrelevant discussion of Mississippi's sordid constitutional history. *See Harness*, 47 F.4th at 311.

No. 19-60662
c/w No. 19-60678

provision and a specific provision, the specific provision prevails." Reading Law at 183. "While the implication of a later enactment will rarely be strong enough to repeal a prior provision, it will often change the meaning that would otherwise be given to an earlier provision that is ambiguous." *Id.* at 330. And a "provision that flatly contradicts an earlier-enacted provision repeals it." *Id.* at 327.

Careening past all these standard interpretive guardrails, the majority circumvents *Richardson*, while purporting not to abrogate it, based on the "evolving standards of decency." *Trop v. Dulles*, 356 U.S. 86, 101, 78 S. Ct. 590, 598 (1958). I am unaware of any case, ever, in which a lower federal court has declared a Supreme Court decision overtaken by subsequent events—without being quickly overruled. At the time *Richardson* was issued, no one would have construed the Eighth Amendment to prevent felon disenfranchisement. Indeed, in *Richardson*, the Court cited "settled historical and judicial understanding." 418 U.S. at 54, 94 S. Ct. at 2670 The Court cited three of its decisions stretching back to the end of the nineteenth century that approvingly referenced felon disenfranchisement, and the Court twice affirmed three-judge court rulings in 1968 and 1973 that rejected challenges to such laws. *See id.* at 53–54, 2670. It is not for this court to say this wealth of authority has become outmoded. *See Agostini v. Felton*, 521 U.S. 203, 207, 117 S. Ct. 1997 (1997) ("The Court neither acknowledges nor holds that other courts should ever conclude that its more recent cases have, by implication, overruled an earlier precedent. Rather, lower courts should follow the case which directly controls, leaving to this Court the prerogative of overruling its own decisions.").

## III.

Even if *Richardson* had never been decided, the majority opinion would still be inconsistent with precedent and the meaning of the Eighth

Amendment.  Felon disenfranchisement is neither cruel, nor unusual, nor a punishment.

## A.

First, the majority incorrectly concludes that Mississippi's felon disenfranchisement law is a "punishment" for Eighth Amendment purposes. The majority correctly recites the two-part test for determining whether something is a "punishment" under the meaning of the Constitution. *See Smith v. Doe*, 538 U.S. 84, 92, 123 S. Ct. 1140, 1147 (2003).  Courts initially ascertain whether "the intention of the legislature was to impose punishment." *Smith*, 538 U.S. at 92, 123 S. Ct. at 1147.  If so, "that ends the inquiry." *Id.*  "If, however, the intention was to enact a regulatory scheme that is civil and nonpunitive, we must further examine whether the statutory scheme is so punitive either in purpose or effect as to negate [the State's] intention to deem it 'civil.'" *Id.* (quotation marks omitted).

The majority neglects, however, to mention that the Supreme Court has already signaled that felon disenfranchisement is not a punishment.  In *Trop v. Dulles*, the plurality wrote the following:

> A person who commits a bank robbery, for instance, loses his right to liberty and often his right to vote.  If, in the exercise of the power to protect banks, both sanctions were imposed for the purpose of punishing bank robbers, the statutes authorizing both disabilities would be penal.  But *because the purpose of the latter statute is to designate a reasonable ground of eligibility for voting, this law is sustained as a nonpenal exercise of the power to regulate the franchise.*

356 U.S. at 96–97, 78 S. Ct. at 596 (emphasis added).[6]  On the strength of this language,  three  other  circuits  have  categorically  held  that  felon

---

[6] The *Trop* Court was ruling in the context of the Ex Post Facto Clause.  But because we assume the Constitution uses the word "punishment" consistently, the test for

disenfranchisement is nonpenal.[7]  Only the Eleventh Circuit has departed
from this categorical holding.  *Thompson v. Alabama*, 65 F.4th 1288, 1304
(11th Cir. 2023) (charging the other circuits with "a misreading of *Trop*.").  I
am inclined to agree with the majority of circuits that *Trop* assumes disen-
franchisement cannot be punishment.  But even the Eleventh Circuit's rea-
soning cannot offer comfort to the majority.  That court still concluded after
applying the relevant test that Alabama's disenfranchisement law, which has
a history and structure very similar to that of Mississippi's, was nonpenal.  *Id.*
at 1308.

   Considering the text and structure of Section 241 demonstrates that it
was not intended as a penal measure.  The majority gives short shrift to these
considerations, which ought to have been its primary focus.  *Doe*, 538 U.S. at
92, 123 S. Ct. at 1147.  To reiterate its language, this constitutional provision
states that a mentally capable person:

> who is a citizen of the United States of America, eighteen (18)
> years old and upward, who has been a resident of this state for
> one (1) year, and for one (1) year in the county in which he of-
> fers to vote, and for six (6) months in the election precinct or
> in the incorporated city or town in which he offers to vote, and
> who is duly registered as provided in this article, and who has

---

identifying constitutional "punishments" is the same for the Ex Post Facto Clause, the
Eighth Amendment, and the Double Jeopardy Clause. *Does 1-7 v. Abbott*, 945 F.3d 307, 313
(5th Cir. 2019).

   [7] *Simmons v. Galvin*, 575 F.3d 24, 43 (1st Cir. 2009) ("The Supreme Court has
stated that felon disenfranchisement provisions are considered regulatory rather than
punitive."); *Johnson v. Bredesen*, 624 F.3d 742, 753 (6th Cir. 2010) ("Moreover, in *Trop v.
Dulles*, the Supreme Court expressly stated that felon disenfranchisement laws serve a
regulatory, non-penal purpose. Accordingly, as a matter of federal law, disenfranchisement
statutes do not violate the Ex Post Facto Clause of the U.S. Constitution."); *Green*, 380
F.2d at 450 ("Depriving convicted felons of the franchise is not a punishment but rather is
a 'nonpenal exercise of the power to regulate the franchise.'" (quoting *Trop*, 356 U.S. at
97, 78 S. Ct. at 596)).

> never been convicted of murder, rape, bribery, theft, arson, ob-
> taining money or goods under false pretense, perjury, forgery,
> embezzlement or bigamy, is declared to be a qualified elector.

MISS. CONST. Art. 12, § 241. This provision does not so much as hint at a punitive intent toward felons any more than it implies an intent to punish non-citizens, short-term residents of Mississippi, those unregistered to vote, or those under the age of eighteen. It does not even single out felons for disqualification from the franchise—it merely defines the franchise in such a way as to exclude them from its bounds.[8] Moreover, Section 241 is part of the Mississippi Constitution's Article 12, which outlines the procedures for elections, not the punishment of criminals. By its own terms, Section 241 is a nonpenal exercise of Mississippi's regulatory authority over the franchise.

The majority opinion attempts to shift focus by pointing to language from the Readmission Act. That act barred Mississippi from depriving "any citizen or class of citizens" of the right to vote "except as a punishment." Act of February 23, 1870, ch. 19, 16 STAT. 67. The majority opinion worries that, if this court does not classify disenfranchisement as punishment, it would call into question whether Mississippi was properly readmitted to the Union, because Mississippi would therefore be depriving a class of citizens of the right to vote for a reason other than punishment. Hence, the majority concludes, any felon disenfranchisement that occurs in Mississippi is *per se* punitive for Eighth Amendment purposes.

---

[8] Compare Mississippi's Section 241 with a portion of the Alabama Constitution recently upheld as a nonpenal regulation of the franchise: "No person convicted of a felony involving moral turpitude, or who is mentally incompetent, shall be qualified to vote until restoration of civil and political rights or removal of disability." ALA. CONST. Art. VIII, § 177. The Eleventh Circuit found this text sufficient to indicate "a preference that [Alabama's] felon disenfranchisement provision be considered civil instead of criminal." *Thompson*, 65 F.4th at 1305.

No. 19-60662
c/w No. 19-60678

But the Readmission Act is not a license to find that the intent of Section 241 was *per se* penal.  Indeed, the Eleventh Circuit was briefed on the substantially identical text of Alabama's Readmission Act, yet nevertheless held that the Alabama Constitution's disenfranchisement provision was nonpenal.  *Thompson*, 65 F.4th at 1305.  Simply put, the question whether Mississippi violated the Readmission Act is separate from the issue before us and involves a completely different set of interpretive questions.  We are not obliged to interpret the word "punishment" to mean the same thing in the Eighth Amendment as in the Readmission Act—unlike our obligation to use the same definition for the Ex Post Facto Clause and the Eighth Amendment.  It could well be that "punishment" in the Act merely means "consequence of a crime," rather than "punitive."  But the proper interpretation of the Readmission Act is not before us.  All this court may do is apply the definition of "punishment" used for Eighth Amendment purposes to the law at hand.

When the provision's text and structure are considered, and precedent is consulted, it becomes obvious that Section 241 is not intended as a punishment.  The majority disregards these sources, choosing instead to rely on the text of the Readmission Act—which ironically was meant to *recognize* the very authority this court now repudiates.  Punitive intent cannot be found on these facts.[9]

## B.

The majority seemingly establishes a categorical rule that permanent felon disenfranchisement is cruel and unusual punishment.  True, there is a passing mention that Mississippi's law is unconstitutional "as applied to

---

[9] The majority forbears analysis of the second prong of the test—whether the provision is so punitive as to negate the state's intention.  I need not address that prong either.  But I found no compelling arguments from the plaintiffs as to why Section 241 ought to be considered "punishment."

No. 19-60662
c/w No. 19-60678

Plaintiffs and their class." But the majority opinion immediately proceeds to apply the test used to determine whether a punishment is *categorically* cruel and unusual. *See United States v. Farrar*, 876 F.3d 702, 717 (5th Cir. 2017). And its language and reasoning are hardly constrained to the facts of the case.

If courts were allowed to interpret "cruel and unusual" in line with the original meaning of those terms, there is no question that felon disenfranchisement would be neither cruel nor unusual. But in *Trop,* the Supreme Court held that the "Amendment must draw its meaning from the evolving standards of decency that mark the progress of a maturing society." 356 U.S. at 101, 78 S. Ct. at 598. In cases involving categorical rules against a type of punishment, this involves two steps. First, courts consider "objective indicia of society's standards, as expressed in legislative enactments and state practice, to determine whether there is a national consensus against the sentencing practice at issue." *Graham v. Florida*, 560 U.S. 48, 61, 130 S. Ct. 2011, 2022 (2010) (quotation marks omitted), *as modified* (July 6, 2010). Second, courts "determine, in the exercise of our own independent judgment, whether [the practice] is a disproportionate punishment." *Roper v. Simmons*, 543 U.S. 551, 564, 125 S. Ct. 1183, 1192 (2005). This assessment includes consideration of "the severity of the punishment in question," "the culpability of the offenders at issue in light of their crimes and characteristics," and "whether the challenged . . . practice serves legitimate penological goals." *Graham*, 560 U.S. at 67.

In applying this line of cases, the majority stretches precedent beyond the breaking point. As this court has recognized, categorical analysis has only been used to declare a narrow and well-defined range of punishments cruel and unusual. "The [Supreme] Court has undertaken categorical analysis only for death-penalty cases and those involving juvenile offenders sentenced

No. 19-60662
c/w No. 19-60678

to life-without-parole." *Farrar*, 876 F.3d at 717.[10]  The ability to vote, though assuredly important, is in no way analogous to death or a minor's life imprisonment.  In fact, courts have uniformly refused to extend the compass of "cruel and unusual" punishments beyond the Supreme Court's rulings.  *Id.* (stating it "would be improper to undertake a categorical analysis" where the court "never established a categorical rule prohibiting" a practice).  Deprivation of the right to vote is not the kind of interest that this narrow category of cases is meant to protect.

In addition, applying categorical analysis here leads to endless confusions.  The problems begin when the majority attempts to identify a "national consensus" against permanent felon disenfranchisement using the "objective indicia" of state laws on the subject.  *Graham*, 560 U.S. at 61, 130 S. Ct. at 2022.  And the unsuitability of categorical analysis becomes even clearer once the majority proceeds to find Section 241 unconstitutional in its "independent judgment."  *Id.*

Because no two states share the same voting laws, it is not hard to find a "national consensus" against any one state's practices.  As the majority's appendix illustrates, a few states always or usually allow voting during incarceration.  Some states allow felons to vote after their release.  Some allow voting after they complete a prison term, probation, and parole.  Some require felons to first pay all owed fines and restitution.  Some have statutorily defined waiting periods.  And some, like Mississippi, permanently disenfranchise felons.  Moreover, this list does not even begin to delve into the

---

[10] *See also United States v. Cobler*, 748 F.3d 570, 580–81 (4th Cir. 2014) ("The present case involves neither a sentence of death nor a sentence of life imprisonment without parole for a juvenile offender, the only two contexts in which the Supreme Court categorically has deemed sentences unconstitutionally disproportionate."); *United States v. Walker*, 506 F. App'x 482, 489 (6th Cir. 2012) (finding categorical analysis "does not apply in cases where the defendant receives a sentence that is 'less severe' than a life sentence.").

intricacies of these laws, such as which felonies they cover and the procedures for the restoration of voting rights.  A reasonably clever lawyer could find a dozen ways to divvy up states and find a national consensus against any particular practice.

Even worse, the majority opinion fails to offer a defensible bright line. If the importance of voting rights makes Section 241 cruel and unusual, then why would any form of post-incarceration disenfranchisement be constitutional?  For that matter, why would disenfranchisement *during* incarceration be constitutional?  To point to the length of the disenfranchisement does not resolve the matter, because in the vast majority of states, a felon can be incarcerated for life—and thereby forfeit, for life, his right to vote.

In an effort to avoid some of these problems, the majority does not quite hold that Mississippi can *never* permanently disenfranchise a felon.  So long as a felon is serving time in prison, the court implies, it is permissible to strip his right to vote.  Accordingly, not only may the person be disenfranchised for life due to a life prison term, but the death sentence carries the same result.  The panel admits theirs is an "odd" result, in holding that disenfranchisement violates the Eighth Amendment when neither life imprisonment nor capital punishment does so.

The better term, in my view, would be "incoherent."  According to the majority's reasoning, a state can sentence rapists to life in prison, meaning they can never vote—but if they are spared and eventually released, they must be allowed to vote.  A state can *execute* murderers, but it may not keep them from voting if they are released from prison.  In other words, permanent disenfranchisement is fine—so long as it is accompanied by a life sentence or death.  But how could *adding* these sanctions make the loss of voting rights *less* cruel or unusual?  The majority has no credible explanation why the Eighth Amendment permits the harsher outcome yet prohibits the milder.

No. 19-60662
c/w No. 19-60678

The argument that criminals who served their prison sentences have paid their debt to society offers no analytical safe harbor. The consequences of committing a felony rarely end at the prison walls. Many felons are subject to considerable limits on their freedom to move about and work during probation. Sexual offenders are often required to register for the protection of those around them. *Cf. Smith v. Doe*, 538 U.S. 84, 90, 123 S. Ct. 1140, 1145 (2003) (finding such requirements nonpenal). Those with a criminal history are often obliged to report it to potential employers. They may be barred from some occupations entirely, including some forms of public office. Felons may not legally possess firearms. Completing a prison sentence does not entitle felons to all the rights they previously possessed.[11]

Because Section 241, rightly interpreted, does not impose a punishment, and because applying categorical analysis in this case is unprecedented and illogical, it is unnecessary to address the majority's exercise of "independent judgment" in detail. Instead, I will merely note that the majority's discussion of "severity" illustrates the flaws in its approach. As already discussed, categorical analysis is meant for punishments of the highest severity—execution or life imprisonment. *Farrar*, 876 F.3d at 717. Whatever its merits, disenfranchisement of felons is not of the same degree. The majority rightly extols the role of voting in a democratic society, but it cannot cite a single case to accord with its conclusion that disenfranchisement rises to the level of cruel and unusual punishment. The majority's conclusion, in short,

---

[11] Of course, the majority's "paid their debt to society" reasoning would provide fodder for a wealth of Eighth Amendment-based litigation challenging these additional adverse consequences of felon status. That situation would turn the alleged constitutional uniqueness of the plaintiff's First Amendment right to vote into a general weapon against state criminal justice policies. The prohibition on "cruel and unusual punishments" would be effectively mutated into a "harmful and unfair" provision.

is the product of judicial willfulness, not judgment. *Cf.* THE FEDERALIST NO. 78, at 405 (Alexander Hamilton) (George W. Carey & James McClellan, Eds., 2001). And the majority essentially gives away the game when it questions the "marginal deterrent effect the prospect of losing the franchise has when a person committing a felony already faces the more immediate sanction of criminal confinement."[12] The other factors—the culpability of the plaintiffs and the penological goals of the law—are equally inapplicable where the law at issue does not impose a punishment at all.

## IV.

Today's ruling disregards text, precedent, and common sense to secure its preferred outcome. This end-justifies-means analysis has no place in constitutional law. I respectfully dissent.

---

[12] The majority also turns the plaintiffs' burden of proof upside-down by charging the *defendants* with failing to present evidence of a deterrent effect on felons.